828 So.2d 540 (2002)
STATE of Louisiana
v.
Richard KEMP.
No. 2000-K-2228.
Supreme Court of Louisiana.
October 15, 2002.
*541 James P. Manasseh, Baton Rouge, Kathryn F. Simino, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Douglas P. Moureau, District Attorney, Creighton B. Abadie, Baton Rouge, Counsel for Respondent.
PER CURIAM.
On a Saturday afternoon in the fall of 1996, the courtyard of the Wesley Chapel Apartments in Scotlandville, Louisiana, became the scene of separate but related episodes of violence. The first incident claimed the life of Willie "Boo" Landry as he attempted to mediate an upcoming fistfight between his half brother, Jamie Terrell, and relator's friend, Thallamus "Catfish" Wells. The fistfight never took place. Instead, a single bullet fired by relator severed Landry's spinal cord at the neck, and sent him tumbling to the ground as numerous on-lookers scurried for cover. With relator chasing behind him, Jamie Terrell ran to retrieve a gun from a *542 friend. Terrell then became the victim of the second shooting that afternoon, not by relator, but by a police officer who had responded to the report of the Landry shooting, who spotted an armed Terrell running through the apartment complex, and then fired after Terrell ignored several orders to drop his own weapon. In all, according to Detective Keith Bates, lead investigator in the Boo Landry case, 30 officers worked throughout the evening to restore order in the apartment complex.
Relator was charged by grand jury indictment with second degree murder in violation of La.R.S. 14:30.1 for the killing of Boo Landry and with attempted second degree murder, in violation of La.R.S. 14:27; 14:30.1, for the shooting of Jamie Terrell. After trial in March of 1998, jurors rejected his claim of self defense and found relator guilty as charged of killing Landry but not guilty of attempted murder of Terrell. The court subsequently sentenced him to life imprisonment at hard labor. On appeal a divided panel on the First Circuit affirmed relator's conviction and sentence. State v. Kemp, 99-1690 (La.App. 1st Cir.6/23/00), ___ So.2d ___ (unpub'd). A brief dissent argued that "the cumulation of errors by the trial court on evidentiary rulings ... prohibit[ed] the defendant from adequately introducing evidence of self defense or evidence of defense of others." Kemp, 99-1690 at 1 (Pettigrew, J., dissenting). We granted relator's application to reverse the decision below because one evidentiary ruling in particular denied relator a fundamentally fair trial by preventing him from developing evidence which "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (footnote omitted).
According to the state's theory of the case, an unarmed Landry died while trying to ensure that an upcoming fight between his brother and Catfish Wells would remain, in the words of one eyewitness, "an old fashion[ed] fistfight." State witnesses could not agree on whether relator had brandished one or two handguns, or how many shots he fired, when he took aim at Landry standing in front of him. However, they all agreed that Boo Landry had been unarmed and that he had died for no apparent reason. One witness, Fred Parker, who described himself as Landry's best friend, had been standing only feet away when the fatal confrontation occurred. Parker described his friend as a peacemaker, at least to the extent Landry insisted the forthcoming fight would remain a one-on-one, fists-only affair, but he also admitted that Landry, an imposing six footer who weighed approximately 230 pounds and who could "take care of himself," was speaking loudly and aggressively "in real language" to the crowd that had gathered in the courtyard. Landry had also removed a bandana from around his head and wrapped it around one of his fists, a signal, Parker acknowledged, that ordinarily meant his friend was ready to fight. However, in this instance, according to Parker, the gesture meant only that Landry would ensure that no one would slip behind his brother and "crowd" him in the upcoming fight.
The on-lookers drawn into the court yard by the imminent prospect of a fight between Jamie Terrell and Catfish Wells included women associated with both the Landry/Terrell and Kemp/Wells factions. The women began exchanging insults and challenges. According to Parker, relator's girlfriend and mother of his children, Angela Paul, stood among the crowd near Boo Landry. Tempers flared and tensions rose, and Paul called Landry a "bitch." Landry raised his hands, and turned to *543 confront the much smaller Paul because she had "disrespected" him. Parker testified that at that point, relator, who had been standing nearby, placed himself between Landry and Davis, produced two guns from the pocket of his sweatshirt, and opened fire. In Parker's view, relator had responded to Landry's talking back to his girl "by killing him."
The shooting took place outside of the front door of an apartment occupied by Connie Reado, who had been drawn by the commotion to her screened door and witnessed Boo Landry's last moments. Reado testified that the encounter reached its flash point when the women associated with both camps closed on each other, drawing Boo Landry and relator together into a final confrontation. Until that point, Terrell had been challenging an unwilling Catfish Wells to fight while the defendant stood to one side, unengaged. Reado agreed with Parker that Landry was a large man and an intimidating presence in the courtyard and that he had been speaking loudly and aggressively in the moments before he died. However, Reado testified that she had not been able to make out what Landry had been saying. When the women closed on each other, Landry raised his hand, and relator stepped back and opened fire.
The defense portrayed the shooting as the culmination of a series of altercations occurring on Thursday, Friday, and earlier that Saturday, involving relator, Wells, their girlfriends and friends on one side, and, on the other, Landry, Terrell, and their relatives and friends. The Friday incident had involved a brief skirmish between Terrell and Catfish Wells during which, Angela Paul testified, Boo Landry was present and armed with a gun. In the final confrontation on the following day, according to defense witnesses, Landry had a gun in his back pocket. He was shouting and abusive, and raised his hand while threatening several times to slap Paul. Landry towered over her and relator stepped in front of his girlfriend, who was holding the couple's infant. When Landry leaned forward and reached behind his back, relator, approximately the same height as his girlfriend, drew and fired once. Paul ran with the rest of the scattering crowd but saw relator bend over Boo Landry's body and pick up a firearm from the ground before he, too, left the scene. When police arrived, they found next to Landry only a bloodied bandana.
Autopsy results offered some support for defense claims. A single bullet struck Landry, knocking out a tooth and traveling on a slightly downward trajectory to lodge in his spine. While the pathologist testified that any number of scenarios might explain how a bullet fired by a much smaller man could have taken a downward path through the victim's head, he conceded that the wound was inconsistent with an upright Boo Landry taking a bullet shot by a shorter assailant from a distance of a few feet, if the two men were standing on the same level surface.

As part of the defense case-in-chief, counsel called to the stand Detective Keith Bates, the lead investigator on the case. Counsel walked Bates through his police report which included a lengthy synopsis of the investigation and statements given by numerous witnesses after the shooting. Counsel established that testimony given by several witnesses, including Connie Reado, did not match details of the statements provided to the police. Counsel thereby underscored the point that there were "inconsistent statements about how that shooting and the events that happened there occurred." On cross-examination of Detective Bates, the prosecutor then played tape recordings of those witness statements for the jurors. Detective *544 Bates listened to the tapes along with the jurors and acknowledged that his synopsis had in fact not accurately summarized some of the details provided by the witnesses.[1] However, the playing of Reado's statement had fortuitously brought to light a detail that had not emerged in her trial testimony. Reado had given her statement only hours after the shooting incident and at a time when the police were still piecing together the events leading to Landry's death. Although Reado testified that she could not make out what Boo Landry had been saying moments before he died, in her taped statement, when asked by Detective Bates towards the end of the interview whether Landry had done anything to prompt relator to draw his guns, she recalled an event which had taken place on the stairway leading to relator's apartment located directly above her own before the shooting occurred. According to Reado, Boo Landry had come *545 over to her side of the apartment complex to inform relator and Catfish Wells that the fight with his brother Jamie would take place and stated, as the men were coming downstairs, "Do you want to fight it out or do you want to shoot it out?"
Defense counsel immediately objected to that on grounds that the state had suppressed material exculpatory evidence. The prosecutor explained that what Reado had told him was that "she thought she heard that, but that's not what she heard. It's the fist thing." The court, which had conducted a pre-trial in camera review of the prosecution's file for any significant information favorable to the defense, agreed that Reado's statement did not rise to the level of exculpatory evidence and denied counsel's subsequent motion for a mistrial.
The trial court erred. For purposes of the prosecution's due process duty to disclose evidence favorable to a defendant, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), no distinction exists between exculpatory and impeachment evidence. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). While witness statements are normally not discoverable, La. C.Cr.P. art. 723, this discovery rule must give way when a statement contains favorable information for Brady purposes. Kyles, 514 U.S. at 441-45, 115 S.Ct. at 1569-71; see La.C.Cr.P. art. 718. In addition, the prosecution must make timely disclosure of the favorable evidence to provide the defense with adequate opportunity to present the material effectively in its case. State v. Prudholm, 446 So.2d 729, 738 (La.1984). This Court has therefore recognized that late disclosure as well as non-disclosure of exculpatory evidence may deprive the defendant of a fair trial. State v. Williams, 448 So.2d 659, 665 (La. 1984); State v. Landry, 388 So.2d 699, 702 (La.1980); State v. Roussel, 381 So.2d 796, 798 (La.1980). As in the case of complete suppression, the state's failure to make timely disclosure of evidence favorable to the defendant must be evaluated in the context of the entire record. Agurs, 427 U.S. at 112-13, 96 S.Ct. at 2402 ("If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."). Given appropriate circumstances, "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others." Kyles, 514 U.S. at 445, 115 S.Ct. at 1571.
In the present case, while the state called several eyewitnesses to the shooting of Boo Landry, Connie Reado and Fred Parker had the closest vantage points and their testimony offered jurors a mixed portrait of Boo Landry, a peacekeeper, yet also an intimidating physical presence who spoke loudly and aggressively in the moments before he died. As Parker confirmed, Landry had turned to confront Angela Paul, his hand wrapped in a bandana in a gesture even his best friend conceded would signal to the world that he was ready to fight. Even apart from this context, the exculpatory cast of Reado's prior taped statement is immediately apparent because it revealed that Landry had, in fact, said something about "shoot[ing] it out" which may then have prompted relator to draw his own weapon or weapons in the belief Landry was himself armed after the roiling dispute spilled out into the apartment complex courtyard. The significance of this statement is so apparent that any prosecutor "mak[ing] judgment calls about what would count as *546 favorable evidence," would have disclosed it if he or she were at all "anxious about tacking too close to the wind." Kyles, 514 U.S. at 439, 115 S.Ct. at 1568.
Nevertheless, in the present context, "the touchstone of due process analysis... is the fairness of the trial, not the culpability of the prosecutor.... [T]he aim... `is not punishment of society ..., but avoidance of an unfair trial to the accused.' " Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982) (quoting Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963)). Jurors eventually listened to Reado's taped statement and defense counsel may have been in a position to recall her to the stand to underscore for jurors the significance of the newly disclosed information on the taped statement and to correct the impression she had given in her testimony for the state that she had been unable to discern what Boo Landry had been saying before he died. The trial court had instructed her to remain available after she testified in the state's case in chief and Reado was presumably still available when the state played her taped statement. See State v. Davis, 498 So.2d 723 (La.1986).
However, Detective Bates testified towards the end of the defense case, and the trial was drawing to a close. Given the present record, including the objective findings of the autopsy which did not exclude the possibility that Landry died when reaching behind his back for a weapon, the details provided by Reado in her taped statement which had Landry offering an option to "shoot it out" possess such potential to give the evidence at trial an entirely different cast that undermines confidence in this jury's rejection of relator's self-defense claim. To this extent, the state's failure to provide timely disclosure impacted the fundamental fairness of the proceedings leading to relator's conviction.
Accordingly, the decision of the court of appeal is reversed. Relator's conviction and sentence for second degree murder are vacated and this case is remanded to the district court for further proceedings.
DECISION OF THE COURT OF APPEAL REVERSED; CONVICTION AND SENTENCE VACATED; CASE REMANDED.
VICTORY, J., dissents and assigns reasons.
VICTORY, J., dissenting.
I respectfully dissent. As the majority's per curiam points out, the trial court reviewed the State's file in camera for Brady material, and found none. Further, after the jury heard Reado's taped statement and defense counsel could have recalled her to the stand for cross-examination of the statement and emphasized her statement in closing arguments to the jury. In my view, any error was harmless.
NOTES
[1] In a separate assignment of error, relator complains about the playing of the witnesses' taped statements during Detective Bates's testimony in the defense case-in-chief. Louisiana's Code of Evidence has no provision comparable to Fed.R.Evid. 106, which expressly provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." (emphasis added). However, we have recognized that the rule of completeness embodied by this provision of federal law plays a role in Louisiana law as well. State v. Duke, 97-3059, p. 3 (La.10/30/98), 724 So.2d 730, 731 ("In all of its aspects, the rule of completeness serves two purposes: (1) it secures for the tribunal a complete understanding of the total tenor and effect of an utterance; and (2) it guards against the danger than an out-of-context statement may create such prejudice that it is impossible to repair by a subsequent presentation of additional material.") (internal quotation marks and citations omitted.)

At least as a general matter, the trial court did not err in allowing the state to play the recorded witness statements during the testimony of Detective Bates, although the playing of the tapes substantially interrupted the presentation of the defense case. The state thereby corrected some of the misstatements in the detective's synopsis of his investigation and provided the jury with a context for determining the extent to which, as claimed by defense counsel, the witnesses' trial testimony may have diverged from their initial accounts of the events surrounding Boo Landry's death.
However, the rule of completeness did not apply to new evidentiary material the recorded statements may have provided jurors. With Detective Bates on the stand, the trial court reversed its previous ruling which had prohibited the state from introducing any evidence regarding relator's statements or admissions made before the offense. The trial court imposed that ban as a sanction for the state's failure to comply with its discovery obligations. The trial court changed its position after concluding that the defense had opened the door for rebuttal evidence of relator's admissions by the state when it presented its defense of justification and placed relator's state of mind at issue. However, without regard to the merits of that ruling, the preference for live testimony incorporated in the Confrontation Clause of the Sixth Amendment required that the state recall the witnesses as part of its rebuttal case as opposed to introducing the unsworn, recorded out-of-court statements of those witnesses. California v. Green, 399 U.S. 149, 156, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970) ("[T]he particular vice that gave impetus to the confrontation claim was the practice of trying defendants on `evidence' which consisted solely of ex parte affidavits or depositions securing by the examining magistrates, thus denying the defendant the opportunity to challenge his accuser in a face-to-face encounter in front of the trier of fact.").
However, because of our reversal of this case on other grounds, we need not address this aspect of trial court's evidentiary rulings in any further detail. This problem presumably will not arise at any retrial, now that the defense has been provided the statements and the particularized notice required by the discovery provisions of La.C.Cr.P. art. 716. At least as a matter of its discovery obligations, the state is in a position to present the evidence directly as part of live testimony from its witnesses in its case in chief.