832 So.2d 1110 (2002)
STATE of Louisiana
v.
Levi Joseph GARRICK.
No. 02-0712.
Court of Appeal of Louisiana, Third Circuit.
December 11, 2002.
Robert F. DeJean, Jr., DeJean, DeJean, & DeJean, Opelousas, LA, for Defendant/Appellant, Levi Joseph Garrick.
Earl B. Taylor, District Attorney, Opelousas, LA, for Appellee, State of Louisiana.
Court composed of ULYSSES GENE THIBODEAUX, SYLVIA R. COOKS, and JIMMIE C. PETERS, Judges.
PETERS, J.
The defendant, Levi Joseph Garrick, was charged by bill of information with armed robbery, a violation of La.R.S. 14:64. After trial, a jury returned a verdict of guilty as charged. The trial court then sentenced the defendant to serve twenty-five years at hard labor without the benefit of parole, probation, or suspension of sentence. The defendant has appealed his conviction, asserting four assignments of error. For the following reasons, we reverse the defendant's conviction, set aside his sentence, and remand this matter for a new trial.
*1111 The criminal charge filed against the defendant arises from an armed robbery of the Palmetto, Louisiana branch of the Washington State Bank. On March 27, 2001, at approximately 9:40 a.m., Joseph Hilton Kelly and Skyler Guidry, armed with pistols, entered the bank and took over $20,000.00. At the time of the armed robbery, the defendant was outside the bank in the getaway vehicle. The men fled the scene, and, shortly thereafter, West Baton Rouge Parish law enforcement officers stopped them as they drove East on U.S. Highway 190. The officers recovered almost all of the money taken from the bank, three sets of gloves and hoods, and three weapons.

Assignments of Error Numbers 1 and 2
Both of these assignments of error relate to Guidry's testimony at trial. The defendant asserts in these assignments of error that the trial court erred in not granting a mistrial, or at least a continuance, because of the state's actions in obtaining Guidry's testimony.
On December 5, 2001, the trial court impaneled a twelve-person jury. The trial on the merits began on December 13, with the jury returning its verdict the next day. The day before the trial began, the state and the defendant filed a written joint stipulation concerning the status of discovery in the litigation. This stipulation stated in part:
Defendant herein, though [sic] counsel, reserving the right to file timely additional motions as provided by law, together with counsel for the State of Louisiana, stipulate that the undersigned Assistant District Attorney has provided a copy of the entire Law enforcement agency investigative file in this matter to the defendant. The State agrees to provide to the defense any additional Law enforcement agency investigative material subsequently obtained. Specifically excluded is any work product of the district attorney's office obtained either by the assistant district attorneys, the district attorney's staff or any other personnel acting for or on their behalf. The State further recognizes its continuing obligations to disclose any exculpatory evidence discovered, irrespective of the source. The defendant stipulates that receipt of this file serves as notice of the State's intention to introduce all evidence (including defendant's statements) included therein. The production of this file constitutes full satisfaction of the Motion for Discovery and Inspection, Motion for Bill of Particulars, Motion for Preliminary Exam and all request [sic] for Public Records pursuant to La. R.S. 44:1, et seq. The defendant and the State further stipulate that receipt of this file obligates the defense to timely disclose to the State all materials discoverable by the State pursuant to La.C.Cr.P., arts. 724-728, including but not limited to notice of defense based on mental condition and notice of alibi.
(Emphasis added.)
However, despite the clear language of this stipulation, the state had not supplied the defendant with full, open file disclosure. On December 6, 2001, six days before entering into the stipulation and the day after the jury had been impaneled, the state, through both the district attorney's office and the attorney general's office, had filed a joint motion pursuant to La.Code Crim.P. art. 439.1 to compel Guidry's testimony in the defendant's trial. Louisiana Code of Criminal Procedure Article 439.1 provides:
A. In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a grand jury of the state, at any proceeding before a court of this state, or in response *1112 to any subpoena by the attorney general or district attorney, the judicial district court of the district in which the proceeding is or may be held shall issue, in accordance with Subsection B of this article, upon the request of the attorney general together with the district attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in Subsection C of this article.
B. The attorney general together with the district attorney may request an order under Subsection A of this article when in his judgment
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self incrimination.
C. The witness may not refuse to comply with the order on the basis of self incrimination, but no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.
D. Whoever refuses to comply with an order as hereinabove provided shall be adjudged in contempt of court and punished as provided by law.
The state acknowledged in argument to the trial court that this motion was not made available to the defendant in the open file discovery process and that the defendant only became aware of the motion when the trial court granted it immediately before the trial began on the morning of December 13.
Prior to granting the motion, the trial court held a recorded conference in chambers with counsel for the state and the defendant present, as well as two attorneys responsible for Guidry's defense. One of the other two attorneys present had previously represented both Guidry and Kelly, and, on the morning of December 13, the court relieved him of representation of both defendants. That same morning, the trial court appointed the other attorney, a member of the local indigent defender board, to assume the responsibility of representing Guidry.
In this conference, the state informed the trial court and the defendant that the state's investigator had obtained a statement from Guidry that morning and that the state had offered Guidry a twenty-five year sentence cap in exchange for his truthful testimony. When defendant's counsel inquired if the morning's statement had been taped or reduced to writing, he was informed by the state that it had done neither. Thereafter, the following exchange took place:
MR. DEJEAN [COUNSEL FOR DEFENDANT]: Because of this instance, your Honor, this was all filed this morning, it'swe assumed that we had everything in the D.A.'s file. He knew he was going to bring Mr. Guidry into the courtroom and I'm going to ask for a continuance or a mistrial because we certainly need to regroup on the defendant's standpoint at this time.
THE COURT: And what is your reason for that? What would you be entitled to that you would not have been entitled to before this information was received?
MR. DEJEAN: Well, your Honor, we were certainly entitled to know whether or not they were going to force this man *1113 to compel, use his testimony, and make a deal with him. They didn't just decide this yesterday. And we had no knowledge of it. It's a surprise to us. I'm asking for a continuance or mistrial until such time that I can regroup with my client.
THE COURT: Mr. Richard?
MR. RICHARD [COUNSEL FOR THE STATE]: He was aware that this defendant had given a statement implicating his client and he was aware this morning that this guy, Mr. Guidry, was goingwe had a motion which you just signed today so I mean, it was signed this morning. And I don't think that he can claim that he has a right to discover that at all. I mean, he's gotten everything Idid you get open file, Mr. DeJean?
MR. DEJEAN: Yes.
MR. RICHARD: Okay, so he got a copy of the entire District Attorney's file.
MR. DEJEAN: Nothing dealing with this. Nothingnothing dealing with this, your Honor.
THE COURT: Can you point to any authority which would have required him to do anything earlier than he did today?
MR. DEJEAN: An agreement that he would give us his entire file.
THE COURT: And do you have any evidence to present that he did not give you everything that's in his entire file?
MR. DEJEAN: Well, your Honor, I'm asking the Court to conclude that this has not just come up this morning.
MR. RICHARD: No, the stuff I sent to Mr. Screen earlier, yes.
MR. DEJEAN: Well, there you go. I mean, you can't take it out of file and say here's open file.
MR. RICHARD: Well, the agreement
MR. DEJEAN: And it's not part of the file.
THE COURT: Hold on a second. Mr. Richard, was Mr. Guidry listed as a witness?
MR. RICHARD: Yes, sir, he's on the subpoena list, the original letter sent to the Clerk of Court dated some time back. If we get the file, the file of the District Attorney, he's the last named person on the District Attorney's list.
THE COURT: Was there any discovery propounded by you, Mr. DeJean, which requested a list of witnesses that you did not receive?
MR. DEJEAN: No, your Honor. But I think that I have every right under the rules of procedure to believe that this man does not have to testify until such a time as some time [sic] of agreement is made or a motion to compel is filed becauseI've had it with Mr. Richard before where they had to have the Attorney General's permission, authority. It has come to the authority of the Attorney General and it was not in the open file that I got, neither was the witness list, your Honor.
THE COURT: Mr. Richard, last bite and then I'm going to make a ruling.
MR. RICHARD: Oh, I think the witnessthe letter, the witness list, is public. It's part of the record in this case.
THE COURT: Okay, what I'm asking you, Mr. DeJean, is did you file a specific request for a list of witnesses to Mr. Richard or to the District Attorney's Office?
MR. DEJEAN: No, your Honor. What I was told and what I have is something signed by him that I have everything in his file and that he would give it to mehe would have given it to me on a continuing basis.
THE COURT: Okay.
*1114 MR. DEJEAN: If the
MR. RICHARD: The problem
MR. DEJEAN:and this is not in his file.
MR. RICHARD: But the one exclusion is we do get to keep our work product and that'sI don't think that this is evidence. I mean, that's the other thing, I'm sorry, Judge. But it's not evidence.
MR. DEJEAN: I would like to, if I could your Honor, for the record, one second.
THE COURT: Sure.
MR. DEJEAN: I would like to, it is so newly filed that it's not even yet into the court record, no holes have been punched in it, nothing. It was done and presented this morning immediately prior to trial.
THE COURT: The Court makes note of the same for the record for you. I'm going to deny the motion to continue and the motion for mistrial. Okay, let's proceed.
The problems with Guidry's testimony do not end at this point. As the state's first witness at trial, he presented conflicting testimony on numerous critical factual points, as well as testimony exculpatory to the defendant.
According to Guidry, Joseph Hilton Kelly and the defendant came to his home on the evening of March 26, 2001, and drove him to the Plantation Inn Motel near Lafayette, Louisiana, where the three men joined two women, Latoya Bienvenu and Audrey Babineaux. Guidry testified that, while on the way to the motel, Kelly told him that they were going to rob a drug dealer and that Kelly offered him crack cocaine in exchange for his help.
The three men and two women spent the night consuming alcohol and illegal narcotics in a room at the motel. Guidry testified that the robbery plan continued to be discussed during the night and that at some point in the planning, they agreed to use Ms. Bienvenu's maroon-colored sports car in the robbery instead of Kelly's Chevrolet Caprice. At this point in Guidry's testimony, the defendant sought and received another conference outside the presence of the jury.
In the conference that followed, the defendant again asked for a mistrial or, in the alternative, a continuance. This exchange followed this motion:
MR. DEJEAN: ... This goes back to what the prior motion was when we made a motion for mistrial based on surprise on testimony of this witness. And now, number one, Mr. Richard asked him a question knowing that the witness's answer would be relative to the commission of another crime which was robbing a drug dealer which I have no information about. And now all of this has come out. Again, relying on what I said prior, the fact that we were not notified, the fact that we were guaranteed in writing by the District Attorney and under his signature of the District Attorney's Office, Mr. Tromblay signed it, that we would be given updates. We weren't given anything until this morning and I have a right to it. I mean, they told me they were giving me full open file, everything in their file, everything they knew about. They gave me other statements. Okay, that was misleading. I'm not saying it was intentional. I don't have to say it's intentional. The Court draws his own conclusions about certain facts. We're severely prejudiced by this and again, I'm urging a continuance or the mistrial.
THE COURT: Mr. Richard?
MR. RICHARD: I certainly hope they're prejudiced by it, but not all prejudice is reversible or leads to a mistrial. A, it's not in my file. B, the witness *1115 testified. He's never spoken to me. C, it's admissible as what I still call res gestae although the professors argue with me because it's part and parcel of the planning. D, it's not commission of another crime; it's the planning of what this one started out to be a robbery of a drug dealer and it changed. So it's not commission of another crime, it's the planning of this crime. And if they take several permutations, that's the defendant's problem, not the State's and I'm not obligated to give him to know what's in a witness's mind. I've given himhe said he had a copy of my entire file. That's it. It's not an obligation and this is not like the federal court where I have to give him an outline of every witness's statement. In feds they have to do that, they have to give out a precis or something like that to the defense counsel and we don't have that, thank God.
THE COURT: The Court notes that
MR. DEJEAN: Your Honor, I would like to comment again. If he has guaranteed me in writing signed by the office of the District Attorney that he will give it to me, it'ssure, if there is no open file, then I have a burden of filing certain things. But when I have it in writing from him, and I believe the Clerk put it in the record this morning, I was told that they did, if not I'll reserve my right to put it into the record relative to these motions, I have the guarantee that he's going to give it to me. Nowand he hasn't. Not until this morning did we learn of this man testifying. So, your Honor, I don't think he can say that this is not federal court so we're not entitled to it. Of course we're entitled to it. He guaranteed he would give it to us. That's number one. Number two, heI'm going to submit to you that he cannot send his investigator to go take a statement this morning, have an oral statement given to him, and then come and tell you well it wasn't in my file because it's over. I submit, your Honor, that we are prejudiced from a standpoint of procedure in the way this matter was handled and even if it may be admissible some time down the line when we have knowledge of it, since he guaranteed us open file, it's not permissible today.
THE COURT: Okay, the Court makes note of the fact that Mr. DeJean indicates that he had open file and we'll make that part of the record and the District Attorney agrees he had open file. The Court further notes that the witness has testified thus far pursuant to Mr. Richard's statement earlier in chambers, which was on the record, that he only received the information as to what this witness was going to give this morning and that it was oral in nature. Third, the Court notes that I don't believe the District Attorney could tell me that he knew whether this individual would acquiesce in the motion to compel despite an order without the cap or with the cap and in view of that, I do not believe it violates the open file discovery in the letter or the spirit in view of the fact that he could know no more than anybody else what this Skyler Guidry was going to do at the time this morning. As a result, the motion for continuance and/or mistrial are hereby denied and I'm happy to make your objection general throughout the testimony of Mr. Guidry.
When Guidry's testimony resumed, he testified that, at some point in the evening, the plan changed from the robbery of the drug dealer to the robbery of the bank.
Upon continued questioning by the state, Guidry stated that, on the morning of March 27, 2001, the three men left the two women at the motel and traveled to *1116 Palmetto to rob the bank. According to Guidry, he and Kelly traveled in Kelly's car while the defendant drove Ms. Bienvenu's car. Upon arriving in Palmetto, they parked Kelly's car on a gravel road approximately one mile from the bank and proceeded to the robbery scene in Ms. Bienvenu's car as planned. Guidry testified that Kelly provided three guns, three pairs of gloves, and masks or hoods to use in the robbery.
To this point, Guidry's testimony clearly suggested a continuing conspiracy to rob the bank. However, he then asserted that, as they drove past the bank a few times and as the effect of the alcohol and drugs they had ingested the night before began to wear off, he and the defendant expressed to Kelly their desire to withdraw from the criminal enterprise. Concerning this attempt to withdraw, Guidry testified to the following:
A. Well, after weafter we rode around for a while, after the alcohol and drugs had done worn off, me and Mr. Levi, we didn't want to do it no more. We changed our mind.
Q. Changed your mind?
A. Uh hum.
Q. And then what happened?
A. Then Mr. Kelly told us that we either help him or else.
Q. Alright.
A. Because me and Mr. Levi, our guns didn't have no bullets. Mr. Hilton's gun the only gun that had bullets.
Q. I see. You didn't have any bullets in your gun?
A. No sir.

. . .
Q. And he pointed the gun at you?
A. Sort of, yeah, kind of threatened us with it.
Q. He kind of threatened you? And so you all went and what did you do after he threatened y'all?
A. He ordered Levi to stay in the car and watch out if any customers would come in the bank.
According to Guidry, Kelly ordered him to enter the bank first, and, as he did, the two ladies in the bank immediately began stacking money on the counter. After Kelly entered the bank, he began putting the money in a bag and made one of the women unlock the rear door of the bank. He also ordered Guidry to bind the two bank employees with duct tape. After binding the two ladies and placing them in a bath room, the two men left the bank through the back door and returned to where the defendant was waiting in the car.
Guidry then testified that Kelly drove Ms. Bienvenu's car back to the gravel road where they had left his car. Even then, according to Guidry, he and the defendant pleaded with Kelly to drop them off, and he refused. After they had switched vehicles, Kelly called Ms. Bienvenu, using a cell telephone, and informed her of the successful robbery, as well as where she could find her car. According to Guidry, Kelly then began driving toward Baton Rouge, Louisiana. They were ultimately apprehended by law enforcement personnel on U.S. Highway 190 in West Baton Parish. Even during this time, according to Guidry, the defendant attempted to have Kelly release him, but Kelly would not. The police recovered most of the stolen money, as well as the guns, masks, and gloves used in the robbery.
On cross examination, Guidry contradicted his direct testimony in numerous ways, including the manner in which the robbery was planned. Despite having initially testified that the plan to rob the bank had begun to take shape on the *1117 evening of March 26, he testified on cross-examination that, when he and the other two men traveled to Palmetto on the morning of March 27, they had not yet discussed robbing the bank and were looking for the drug dealer. According to Guidry, it was only after the three men arrived in Palmetto that Kelly mentioned robbing the bank. Concerning his inability to withdraw from the criminal enterprise, even after the robbery, the following exchange took place during cross-examination:
A. Uh hum, we say we wanted to get out.
Q. And Mr. Kelly saidwhat was Mr. Kelly's reply?
A. "I'm not letting y'all out."
Q. Did you try to tell him also to let y'all out?
A. Yes, sir.
Q. Were you scared that he might shoot if you tried to resist him?
A. Yeah, I was because the man, he's mentally ill. He has a mental problem and I know him to go off on people before in the past.
Q. And he was in that temperament right then and there? In other words, you felt like he might go off on y'all if you pushed him too far?
A. That's the way it seemed. I didn't know what he was capable of.
In State v. McCartney, 96-58, p. 12 (La. App. 3 Cir. 10/9/96), 684 So.2d 416, 425, writ denied, 97-0508 (La.9/5/97), 700 So.2d 503, cert. denied, 522 U.S. 1002, 118 S.Ct. 573, 139 L.Ed.2d 412 (1997), this court stated:
Under Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ], due process is violated by the suppression of favorable evidence by the prosecution when the production of such evidence is requested and when the evidence is material to either the guilt or innocence of the accused, regardless of the good or bad faith of the prosecution. In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), this concept was extended to include evidence that impeached the credibility of the prosecution's witnesses.
In brief, the state asserts that Guidry's testimony was obtained in the following manner:
After the jury was selected, the State sought to discuss the matter with Guidry in preparation for trial; the State's counsel then discovered Guidry would not cooperate and so the Motion to Compel his testimony was necessitated. There is no basis in fact or law which requires the State to give a defendant information it does not have. The Order to Compel was not signed by the trial judge until the date of trial; the State did not have access to [Guidry]'s testimony until that time. In fact, in order to assure his testimony, despite the Order, the State had to promise Guidry a cap of twenty-five years of sentence exposure.
While there exists no evidence of record to suggest the accuracy of this statement, it is troubling in many respects. First, since the motion was filed on the day after the jury was selected and six days before the open file discovery agreement was executed by the state, it establishes another fact that was not provided to the defendant in the open file discovery process. Additionally, the record reflects that trial was to begin at 9:00 a.m. on December 13, 2001. The court minutes reflect that the chambers *1118 conference to discuss Guidry's testimony began at 10:40 a.m., after the jury had been seated, the witnesses had been sequestered, the trial court had given its preliminary instructions, and the state gave its opening statement. Thus, all of the discussions with Guidry and/or his counsel, if occurring after the trial court executed the motion to compel, were compressed into a short period of time on the morning of December 13. Also, left unanswered are the questions of why the state felt obligated to offer Guidry a twenty-five year sentence cap, given the mandatory language of La.Code Crim.P. art. 439.1, and whether the trial court had agreed to the sentencing cap since the state does not impose sentence in criminal cases.
Equally troubling is the fact that the state chose not to inform the defendant of the exculpatory nature of Guidry's testimony when it became available on the morning of trial. We find nothing within the mandate of Brady to suggest that the state's continuing obligation ceases on the date of trial. Thus, in this case, we are left with two possible scenarios. Either the statement made to the state's investigator on the morning of trial was different from the testimony presented by Guidry, in which case the state had an obligation to inform both the trial court and the defendant, or the state simply chose not to inform the defendant of the exculpatory testimony it anticipated from Guidry.
While acknowledging in brief its Brady obligations and appearing to acknowledge that it violated its obligations, the state cites State v. Ancar, 508 So.2d 943 (La. App. 4 Cir.1987), for the rule of law that every failure on the part of the state to comply with discovery procedure does not require an automatic reversal. While we agree with the holding in Ancar, we do not find it applicable in this case. In Ancar, the defendant had filed formal discovery requests for certain specific information. The state initially answered these requests by denying the existence of the information requested. However, the state later filed notices of its intent to use certain evidence that it had previously denied existed. The fourth circuit concluded that the trial court erred in admitting the evidence, but found that "these errors do not warrant a reversal because on the record before us we are convinced that the jury reached the correct conclusion." Id. at 946. Additionally, unlike the matter now before us, the state asserted that it was not aware of the evidence when it formally answered the defendant's discovery motions and that it had orally informed the defendant of the evidence after it became aware of its existence. Even more important, the improperly admitted evidence in Ancar was not of an exculpatory nature.
Louisiana Code of Criminal Procedure Articles 716 through 723 provide the specific rules governing discovery by a defendant. Certainly, these rules can be modified by agreement between the state and a defendant, and open file discovery is a commendable modification that serves to expedite the discovery process and the overall administration of justice. However, when the litigants chose to modify the discovery process and enter into an open file discovery agreement, it must be fully complied with in good faith. Failure of full, good faith compliance cannot be looked upon as harmless error where the failure relates to a due process violation such as failure to divulge exculpatory evidence.
We do not find that the trial court erred in denying the requests for a continuance. *1119 Louisiana Code of Criminal Procedure Article 707 provides that a motion for continuance "shall be in writing" and "shall be filed at least seven days prior to the commencement of trial." Additionally, La. Code Crim.P. art. 708 provides that "[a] continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced." "A jury trial commences when the first prospective juror is called for examination." La.Code Crim.P. art. 761. In the matter before us, the entire jury had been impaneled, and opening statements had begun. Therefore, the defendant's motion for a continuance was neither in proper form nor timely sought.
The Louisiana Supreme Court recently considered a case similar to one before us. In State v. Kemp, 00-2228, p. 6 (La.10/15/02), 828 So.2d 540, the defendant appealed his conviction and sentence, asserting that the state "suppressed material exculpatory evidence." At trial, defense counsel objected to live witness testimony which deviated substantially from the taperecorded statement given by the witness only hours after the incident at issue in Kemp. The trial judge conducted an in camera review of the state's file, but concluded that the witness' tape-recorded statement "did not rise to the level of exculpatory evidence" and denied the defense's motion for a mistrial. Id. at 7, 828 So.2d at 545. The first circuit, in an unpublished opinion, affirmed the trial court. However, the supreme court reversed the first circuit, stating:
For purposes of the prosecution's due process duty to disclose evidence favorable to a defendant, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), no distinction exists between exculpatory and impeachment evidence. United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). While witness statements are normally not discoverable, La.C.Cr.P. art. 723, this discovery rule must give way when a statement contains favorable information for Brady purposes. Kyles [v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)]; see La.C.Cr.P. art. 718. In addition, the prosecution must make timely disclosure of the favorable evidence to provide the defense with adequate opportunity to present the material effectively in its case. State v. Prudholm, 446 So.2d 729, 738 (La.1984). This Court therefore recognized that late disclosure as well as nondisclosure of exculpatory evidence may deprive the defendant of a fair trial. State v. Williams, 448 So.2d 659, 665 (La.1984); State v. Landry, 388 So.2d 699, 702 (La.1980); State v. Roussel, 381 So.2d 796, 798 (La.1980).
Id.
The court continued, "`the touchstone of due process analysis ... is the fairness of the trial[.] ... [T]he aim ... "is not punishment of society ..., but avoidance of an unfair trial to the accused."'" Id. at 8, 828 So.2d at 546 (quoting Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982)). Ultimately, the supreme court in Kemp concluded that the "state's failure to provide timely disclosure impacted the fundamental fairness of the proceedings leading to [the defendant's conviction." Id. at 9, 828 So.2d at 546. Thus, the court vacated the conviction and sentence and remanded the case.
In addition, La.Code Cr.P. art. 775(3) provides that a trial judge may order a mistrial and dismiss a jury when "[t]here is a legal defect in the proceedings *1120 which would make any judgment entered upon a verdict reversible as a matter of law." We conclude that the failure of the state, in violation of due process, to provide the defendant with the exculpatory evidence supplied by Guidry is a legal defect in the proceedings of such a nature which makes the verdict reversible as a matter of law. Therefore, we find that the trial court abused its discretion in failing to grant the defendant's motion for a mistrial. In finding merit in these assignments of error, we find it unnecessary to consider the remaining assignments of error.

DISPOSITION
For the foregoing reasons, we reverse the defendant's conviction, set aside his sentence, and remand this matter for a new trial.
REVERSED AND REMANDED.