1MICHAEL E. KIRBY, Judge.

STATEMENT OF THE CASE

On October 20, 1988, a twelve-member jury found relator guilty as charged of second-degree murder. He was sentenced on May 11, 1989 to serve life imprisonment at hard labor without benefit of parole. *962 This Court affirmed. State v. Lindsey, 90-1602 (La.App. 4 Cir. 1/13/94), 631 So.2d 486, writ denied 94-0612 (La.6/28/96), 675 So.2d 1106.
This Court subsequently granted a writ of mandamus pertaining to an application for post conviction relief and ordered the trial court to conduct an evidentiary hearing on relator’s claim that the State withheld Brady material. State v. Lindsey, 98-1064 (La.App. 4 Cir. 6/3/98), 715 So.2d 544. Following some delays an evidentia-ry hearing was held on August 20, 2002; the relator was represented by Loyola Law Clinic which had been appointed to represent him. After hearing testimony and argument, the court reset the matter. On September 6, 2002 additional argument was heard. On September 19, 2002 the trial court issued a written judgment denying relief.
| STATEMENT OF THE FACTS
The facts of this case as set forth in the appeal opinion are as follows:
On December 1,1986, Lindsey lived at the home of his girlfriend, Zena Julien, and her family. On that date Zena took her one-year-old daughter Jovan to a clinic. Lindsey, a merchant marine, had come home after being away at sea. State witnesses testified that Lindsey was not intoxicated, and the family was not drinking that evening. After dinner, everyone was sitting around the table laughing and telling jokes when Zena told everyone about how Jovan had started a fight with another child at the clinic. Lindsey then grabbed Jovan and spanked her forcefully. Zena objected and told Lindsey so. After Lindsey grabbed her arm and twisted it, Zena then told him to leave. Lindsey went into the bedroom and began packing his things.
Zena’s mother, Joan Julien, told her not to put Lindsey out and to go and talk to him. Zena went to the bedroom where he was packing, but returned to the living room because Lindsey was using vulgar language and would not talk to her. She sat down on the living room sofa and, hugging her mother, said “Mom, I think that boy is going to get the gun.” Lindsey then came into the living room and pointed a gun at the two of them. They begged him not to shoot but he shot anyway, fatally wounding Joan Julien. Lindsey then put the gun into his pants and said “Now.”
Zena ran to get help. Officers Edward Perkins and Sherman Joseph responded to the call, observed the victim and sent for an ambulance. Zena pointed out Lindsey, who was standing near the rear side of his car, as the person who shot her mother. Officer Joseph placed Lindsey under arrest and advised him of his rights. Lindsey told the officers, “I did shoot her and the gun is in the trunk.” He then advised Officer Joseph which key opened the trunk, and the officer retrieved a .38 caliber gun from under a suitcase.
Rhonda Madine, a friend who lived in the house with the Juliens, and Zena Julien both testified relative to the events which led to the shooting, although Ms. Madine fled the living room when Lindsey came in with the gun and did not see the actual shooting. Cory Carter, the victim’s 12-year-old son and Zena’s younger brother, witnessed the shooting and his testimony was essentially |3the same as Zena’s except that he could not testify as to what transpired while Zena and Lindsey were in the bedroom.
Dr. Paul McGarry performed the autopsy and testified that, although the victim lingered to the extent that the entrance and exit wounds healed, the effects of the gunshot were continuing *963 and were the cause of death. He testified that the path of the bullet was consistent with the victim being seated and the shooter being at least two to three feet away. Officer Alvin Flint, a crime lab technician, identified photos and evidence, particularly two bullets and one spent casing found on the ground near the scene. Officer John Treadway, a firearms examiner for the crime lab, testified that the spent casing was the same type as the bullets found in the gun, but that the markings after firing one of the bullets were insufficient to determine whether the weapon retrieved from Lindsey’s trunk was the one which fired the spent cartridge found on the ground.
The defense put forth a combined theory of intoxication and accidental shooting. Gregory Evans, a seaman and Lindsey’s friend, testified that he and Lindsey got off a ship that morning and had each drunk a twelve-pack of beer at the union hall between noon and 4:30 or 5:00 p.m. On cross-examination, Evans testified that they split a twelve-pack. Lindsey testified that he and Evans talked and drank a twelve pack at the union hall the morning of the shooting. Lindsey further testified that he left the union hall around noon, went to his sister’s house where he drank some hard liquor and beer, and went home around 3:30 p.m. Lindsey further testified that he had made two or three trips to the car with his things and that the gun went off accidentally on his way to the car when the victim’s son Cory grabbed him.
Lindsey, pp. 2-3, 631 So.2d at 488-89.

DISCUSSION

The claim asserted in the relator’s application for post conviction relief was discussed at length by this Court when it ordered an evidentiary hearing:
In his application, relator asserts that he is entitled to a new trial based on newly discovered evidence. Specifically, relator asserts that the state withheld favorable and | ¿material Brady evidence from relator thereby violating relator’s constitutional right to a fair trial. Relator states that he obtained a copy of the district attorney’s file on August 6, 1997, whereupon he discovered that the statements of Rhonda Madine and Zena Ju-lien which were given to the police on March 20, 1987, contained exculpatory evidence essential to his defense of intoxication. He asserts the statements contradict the witnesses’ trial testimony relative to his intoxication at the time of the shooting. He argues that if he had been provided with the statements he could have impeached the witnesses’ trial testimony.
The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Brady rule is based on due process of law. “[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment.” State v. Rosiere, 488 So.2d 965, 970 (La.1986). The test for determining materiality was first es *964 tablished in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). However, in Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Supreme Court recently outlined the considerations for determining whether allegedly-suppressed evidence is material. These considerations were summarized in a recent decision by the Louisiana Supreme Court, State v. Marshall, 94-0461 (La.9/5/95), 660 So.2d 819:
The issue is whether the exculpatory evidence is material under the Brady-Bagley-Kyles line of cases. Evidence is material only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed to the defense. A reasonable probability is one which is sufficient to undermine confidence in the outcome. [United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)]. [The reviewing court] must provide a cumulative evaluation of the suppressed evidence, keeping in mind that [the defendant] does not have to show that, with the addition of the suppressed evidence, his trial would have resulted in acquittal or that there would be an insufficiency of the evidence to support a conviction. [The defendant] need only show that “disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable.” Kyles, 115 S.Ct. at 1569.
State v. Marshall, 94-0461, pp. 19-20, 660 So.2d 819.
In support of his claim, relator has attached copies of the statements of the two witnesses, a copy of defense counsel’s motion for production, inspection and copying which was filed on September 15, 1987, and a copy of the state’s answers which were filed in October, 1987. In his motion, defense counsel specifically asked for any written statements containing favorable and material evidence from any person with knowledge of the crime. The state answered “Not entitled”. A review of the witnesses’ statements shows that both witnesses told the police that relator was intoxicated at the time of the shooting.
In her statement, Ms. Rhonda Madine stated that relator came home drunk, and that he started cursing and carrying on. She described him as acting very unusual. She also stated that Ms. Zena Julien told him not to curse in front of her mother and that if he was going to continue to curse he could just leave. Relator began packing his belongings and putting them in the trunk of the car. The victim told Zena to tell relator not to put his clothes in the car because he was drunk and would get into an accident. Relator entered the house with a gun. Ms. Madine stated that she grabbed her baby and ran and stood by the doorway between the living room and the kitchen. She did not see relator shoot the gun but heard the victim ask relator not to shoot. Then she heard the gunshot.
In her statement, Ms. Julien stated that she arrived home around 5:00 p.m., and relator arrived a short time after. She stated that when she told him that her baby had gotten into a fight with another child at the clinic, relator | fibecame angry and “wacked her on her butt”. She stated that she pushed relator and grabbed the baby. Relator became more angry and cursed and twisted her arm. She told relator to leave the house. Relator began to pack his clothes and started bringing his belongings out to the car. The victim, Ms. Julien’s mother, told her not to allow *965 relator to leave because he was drunk and would get into an accident. Relator entered the home with a gun and shot the victim in the chest. When questioned further, Ms. Julien stated that when relator came home he was drunk and she could smell liquor on his breath. She described relator as so drunk that he was “stumbling” around and when she “tapped” him he “fell over”.
Where the circumstances indicate that an intoxicated condition has precluded the presence of a specific criminal intent, this fact constitutes a defense to the prosecution for the crime. La. R.S. 14:15. Criminal intent may be inferred from the circumstances of the crime and the defendant’s activities. State v. Graham, 420 So.2d 1126 (La., 1982), State v. Vanvorst, 505 So.2d 123, 128 (La.App. 4th Cir.1987), writ denied, 533 So.2d 12 (La.1987[1988]).
Second degree murder is the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).
La. R.S. 14:31(A)(1) provides:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
Because the factors, “sudden passion” and “heat of blood”, are not elements of the crime, the state does not bear the burden of proof. Also, there is no requirement that the factors be affirmatively established by the defendant. Instead, the jury is free to infer the mitigating circumstances from the evidence. State v. Lombard, 486 So.2d 106, 110-111 (La.1986), State v. Landry, 499 So.2d 1320, (La.App. 4th Cir.1986).
|7In the instant case, relator asserted the defense of intoxication. However, the jury only heard relator’s testimony and that of his friend that relator was intoxicated on the day of the shooting. The jury did not have the benefit of knowing that two of the state’s witnesses, Zena Julien and Rhonda Madine, both gave statements to the police that relator was intoxicated when he shot the victim. In addition, this Court in the appeal opinion indicated that none of the state’s witnesses testified at trial that relator was intoxicated when he shot the victim. Thus, the only evidence of the mitigating circumstances of intoxication for the jury to consider came from the defense. If the statements made to the police had been made available prior to trial, relator may have been able to impeach these witnesses. If the jury had been apprised of the prior statements of Zena Julien and Rhonda Madine, the jury may well have returned a lesser verdict.
Lindsey, 98-1064, pp. 1-5 (La.App. 4 Cir. 6/3/98), 715 So.2d at 545-47.
At the evidentiary hearing, the relator presented only one witness, Ms. Laurie White, who testified that she was an assistant district attorney assigned to Section “G” during the time that the relator was being prosecuted for this crime. According to Ms. White, Section “G” was her first trial section, and the district attorney’s file indicated that she participated in several matters, including acting as lead counsel at relator’s trial. However, she was not in Section “G” continuously, and she did not *966 participate in some of the motions. Ms. White testified that there were problems in getting the trial judge at the time to bring this case to trial. By the time the case was ready for trial, Ms. White was called back to the section to handle the ease because the assistant assigned to Section “G” was new.
When asked about this specific case and materials in the district attorney’s file, Ms. White testified that she had no specific recollection of what had been in the file, but she believed it would have contained police reports and any witnesses’ statements taken by the police. Ms. White could not recall viewing the witnesses’ statements at issue here, but she did recall going to the home of the victim’s family Rand interviewing witnesses. She further testified that the statements indicated that the defendant was intoxicated, that this information was contrary to what the witnesses had stated at the trial, and the contradictions indicated to Ms. White that she “was not aware of what was in their statements because [she] would have either not allowed them to testify contrary to their statements] or made sure that the defense had the information.” (Ms. White could not recall if she provided the defense attorney, Ray Harris, with the statements prior to trial, but she knew she did not at trial.)
Ms. White reviewed the portion of the trial transcript wherein she specifically asked Ms. Madine[1] if the defendant appeared intoxicated when he returned home and she replied that he did not. She also reviewed the portion of the trial transcript where she asked Ms. Julien if the defendant appeared drunk when he arrived home and she had replied no. Ms. White stated that these answers were contrary to the statements given to the police by Ms. Madine and Ms. Julien. Ms. White further stated that if the statements had been in the district attorney’s file and she “knew what they contained, they would have absolutely — [she] would have turned them over, and [she] would have been required by law and ethics to turn them over.” During cross-examination by the State, Ms. White testified that she believed the defense attorney Ray Harris did not have the witnesses’ statements because “if he had the statements, surely he would have used them” given the intoxication defense he presented.
Aside from introducing the various documents supporting the relator’s claim, the relator presented no other evidence at the August evidentiary hearing. 19On September 6, 2002, counsel for the relator reminded the court that numerous attempts had been made to procure the attendance of the defense counsel Ray Harris but all attempts had failed.[2] During this proceeding, relator’s counsel argued that it should be presumed that Mr. Harris did not have the witnesses’ statements because he did not use them to impeach the witnesses, and furthermore, in response to the discovery request filed by Mr. Harris, the State had specifically responded that the defense was not entitled to Brady material. The specific request included a request for witnesses’ statements which tended to exculpate the defendant, were impeachment material, or tended to prove a defense. Additionally, counsel for relator emphasized that Mr. Harris had filed a notice of intoxication defense, had asked for a jury instruction on intoxication, and presented a *967 witness who testified that he had been drinking with the defendant much of the day of the offense.
The State argued at the September proceeding that the relator had failed to carry his burden of proving that the witnesses’ statements had not been turned over because Ms. White merely could not recall if she had done so and the defense presented no other witnesses. The State also referenced the relator’s post verdict judgment of acquittal wherein he had mentioned police officers testifying at trial that the defendant appeared intoxicated. However, counsel for the relator asserted that only one police officer testified about possible intoxication, and his testimony was simply that he smelled alcohol on the defendant’s breath.
As noted, the trial court ultimately issued a written judgment denying the relator’s application for post conviction relief. The court found that there was 1 minsufficient evidence “to make a definitive finding that the defendant was denied the above information” or that it would have made a material difference. The court’s judgment referenced that the trial defense attorney Ray Harris “was unavailable to assist the court in its investigation.” In summation, the court found that defendant failed to meet his burden.
The relator argues to this Court that he successfully proved by the testimony of Ms. White that the witnesses’ statements were not provided to the defense. While to some extent this is a factual finding, and a trial court’s credibility determination should not be overturned, the trial court did not specifically state that it doubted Ms. White’s credibility. Ms. White certainly testified that, if she had seen the statements in the district attorney’s file, she would have fulfilled her duty of disclosing them. However, she also testified that she did not believe defense counsel had them, as he did not use them for impeachment purposes, and that she was gone from Section “G” for some time, implying that another assistant prosecutor may have handled discovery motions[3]. The impression which Ms. White attempted to give was that the statements were not there when she had the file, but that they may have been at a later point and were not disclosed. Considering that the State’s answers to discovery were that the defense was not entitled to the witnesses’ statements, it appears highly likely that they were not disclosed prior to trial, and Ms. White testified that she did not disclose them during trial. Furthermore, Ms. White’s testimony indicated that she came back to Section “G” solely to try the case; the statements may have been available in the file but she was unaware of them and so did not realize that the trial testimony was Incontradictory. Notably, as the trial court recognized, and the State conceded, even if the statements had not been in the prosecutor’s file, it would not make a difference to a Brady violation because they would be deemed to be in the possession of the State of Louisiana because they were in the police department’s possession.
Aside from the factual issue of whether the statements were withheld, the second question is whether they were material. In this regard, the relator relies on a recent Louisiana Supreme Court case, State v. Kemp, 2000-2228 (La.10/15/02), 828 So.2d 540, which was decided after the trial court issued its judgment in this case. The decision in Kemp strongly supports the relator’s position in this matter.
*968 In Kemp, the defendant was convicted of second degree murder; he was acquitted on a count of attempted murder arising from the same incident. The defense as to both charges was self-defense. According to the Supreme Court opinion, the murder arose from separate but related episodes of violence in a courtyard of an apartment building. The State’s case was that the victim was shot while attempting to mediate a fistfíght which was to occur between the victim’s half-brother and a friend of the defendant. Before the fight could take place, the defendant fired a single shot which severed the victim’s spinal cord. The half-brother then retrieved a weapon, but was ultimately shot by responding police officers when he failed to drop his weapon when they ordered him to do so. The defendant’s conviction was based on the jury accepting testimony which indicated that the victim was unarmed and was merely attempting to see that his brother and the defendant’s Mend would have only a fistfight with no weapons or other persons involved. The State’s witnesses generally testified that a crowd gathered to watch the fight. Among them were several women involved with the two |12factions who began to verbally assault one another. As the crowd became more unruly and their tempers flared, the defendant allegedly interceded between the victim and the mother of his children, then pulled two guns and opened fire. One of the State’s witnesses testified that the defendant had killed the victim for disrespecting his girl.
The shooting occurred in front of Connie Reado’s apartment. She testified that she had gone to her door because of the commotion and observed the women from the two groups close in on each other, causing the defendant and the victim to be drawn into a confrontation. Ms. Reado testified at trial that the defendant had been unengaged in the growing fracas until the final moments when the victim, who was a very large man, said something in a loud and aggressive manner and raised his hand. At that point, the defendant stepped back and opened fire. Ms. Reado stated at trial that she could not hear what the victim had said.
The defense at trial attempted to show that the shooting was the culmination of incidents and altercations which had been going on for three days and involved the defendant and his friends and relatives on one side, and the victim, his half-brother, and various other friends and relatives on the other. In one of the confrontations, the victim allegedly had been armed with a gun. The defense witnesses at trial contended that during the final confrontation, the victim was carrying a gun in his back pocket, was shouting and abusive, and repeatedly threatened to slap the defendant’s girlfriend, who was holding a baby. The defendant stepped in front of her; the victim leaned forward and reached behind his back, at which point the defendant shot him. The autopsy report supported the defense contention that the victim was leaning forward at the time he was shot.
hsDuring the course of the trial, the defense called the lead police investigator. During questioning about his police report and investigation, counsel began to elicit testimony that the witnesses’ statements were inconsistent with their trial testimony. The State during its cross-examination of the detective decided to play tape recordings of the witnesses’ statements, notably that of Ms. Reado. In her taped statement, given only hours after the shooting, she stated that, shortly before crowd had gathered, she had seen the victim approach the defendant and his friend Wells and tell them that “the fight with his brother Jamie would take place and ... [ask], as the men were coming downstairs, ‘Do you want to fight it out or do you want to shoot it out?’ ” Kemp, p. 6, *969 828 So.2d at 545. When this tape was played to the jury, the defense immediately objected and requested a mistrial on the grounds that this exculpatory evidence had been withheld. The trial court, which had conducted a pretrial in camera inspection of the State’s file, ruled that the evidence was not exculpatory and denied the motion. The appellate court subsequently affirmed the defendant’s conviction. The Louisiana Supreme Court reversed, finding that the evidence was exculpatory impeachment evidence. Furthermore, that evidence, when combined with the autopsy findings which did not exclude the possibility that the victim was reaching for a weapon, “possess such potential to give the evidence at trial an entirely different cast that [it] undermines confidence in this jury’s rejection” of the self-defense claim and required reversal even though the statement was actually disclosed prior to the end of the trial. Kemp, p. 9, 825 So.2d at 546. The court noted that the disclosure occurred near the end of the defense case, and thus the prosecution’s failure to timely disclose this impeachment evidence “impacted the fundamental fairness of the proceedings leading” to the defendant’s conviction. Id.
| uKemp is difficult to distinguish from the instant case. Here, the defendant gave notice of an intoxication defense, asked for a specific jury instruction, presented a defense witness, and testified himself to his intoxication. Intoxication apparently was his sole defense. The State specifically questioned and elicited testimony from Ms. Madine and Ms. Julien to refute that defense. Once these two witnesses to the shooting specifically denied that the defendant was intoxicated, their pretrial taped statements were clearly exculpatory impeachment material, even if it were assumed that they were not obviously exculpatory before trial.
Furthermore, although the trial court was apparently unwilling to find that the statements were withheld from defense counsel, the State’s answers to discovery and Ms. White’s testimony certainly indicate that the statements were not provided, because if they had been, defense counsel’s failure to impeach the witnesses would have rendered him grossly incompetent. Moreover, witnesses’ statements are generally not discoverable pretrial pursuant to La.C.Cr.P. art. 723, which provides in pertinent part: “This chapter does not authorize the discovery or inspection ... of statements made by the witnesses or prospective witnesses, ... to the district attorney, or to agents of the state.” See State v. Walters 408 So.2d 1337, 1339 (La.1982); State v. Collins, 01-1459, p. 26 (La.App. 4 Cir. 8/21/02), 826 So.2d 598, 615; State v. Nightengale, 35,805, p. 7 (La.App. 2 Cir. 5/8/02), 818 So.2d 819, 824. Thus, there is no basis to believe that the State would have provided them pursuant to a pretrial request as a matter of routine.
Here the trial court ruled that the evidence was “insufficient to make a definitive finding that the defendant was denied the above information or even that said information would have made a material difference in the outcome of the case.” As to the second finding, the witnesses’ statements were clearly material in h slight of Kemp. As to the first, the record indicates that in written responses to discovery the State refused to turn over the witnesses’ statements. Ms. White testified that she did not believe that they had been prior to trial, although agreeing wholeheartedly that they should have been, and testified unequivocally that she did not turn them over during the trial where she was le^d counsel. We conclude that the trial court erred when it denied relief.

CONCLUSION

For the above and foregoing reasons we grant the writ application and reverse the *970 ruling of the trial court. The matter is remanded for further proceedings consistent with the views expressed herein.
WRIT GRANTED; REVERSED AND REMANDED.

. The transcript misspells the witness’s last name as Nadine.

. The court noted that it had not seen Harris for several years; relator’s attorney pointed out that Harris had been disbarred and "is not amenable to a subpoena” despite their best efforts.

. The State’s answers to discovery, which included the response that the defense was not entitled to witnesses’ statements which may tend to exculpate the defendant or be material to a defense, are not signed by any prosecutor.