848 So.2d 615 (2003)
STATE of Louisiana
v.
George CRAWFORD.
No. 2002-K-2048.
Court of Appeal of Louisiana, Fourth Circuit.
February 12, 2003.
Rehearing Denied March 14, 2003.
*618 John L. Carlton, Brian K. Condon, Eric B. Foker, Arnold & Porter, Los Angeles, CA, and G. Ben Cohen, New Orleans, LA, for George Crawford/Relator.
(Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge DENNIS R. BAGNERIS, SR., and Judge DAVID S. GORBATY).
WILLIAM H. BYRNES III, Chief Judge.
The defendant George Crawford's writ application is granted to review his claims for post-conviction relief. However, upon review, relief is denied, and his conviction and sentence are affirmed.

Procedural History
In June 1995, Larry Lindsey and George Crawford were indicted for the first-degree murder of Sherri Bailes. On January 7, 1997, a twelve-member jury found them guilty as charged, and the next day the jury deadlocked as to the penalty. The trial court sentenced both men to life imprisonment without benefit of parole, probation or suspension of sentence. On appeal, both men requested only a review of the record for errors patent, and this court affirmed both convictions and sentences in an unpublished opinion. State v. Lindsey, unpub. 97-1098 (La.App. 4 Cir. 3/10/99), 737 So.2d 978 (TABLE). The Louisiana Supreme Court denied writs. State v. Lindsey, 99-1122 (La.10/15/99), 748 So.2d 463.
On October 12, 2000, Crawford filed in the trial court an application for post-conviction relief, and the State subsequently filed procedural objections to the writ. The court denied these objections on December 4, 2001. After a hearing on the merits on June 20, 2002, and on July 11, 2002, the trial court denied the application. Crawford noted his objection, timely filed his notice of intent to seek writs, and timely obtained extensions of the return *619 date. He now comes before this court seeking relief from the trial court's ruling.

Facts
The following fact summary was taken from this court's unpublished opinion in Crawford's appeal, State v. Lindsey, id., 97-1098 pp. 2-6, 737 So.2d 978:
At trial the victim's mother, Linda McDonald, testified that her daughter, Sherri Bailes, was twenty-eight years old on September 22, 1994, when she was killed. She lived with her mother and left two children who are being raised by Ms. McDonald. Sherri worked as an outside sales agent for Minute Man Press, and she had a cocaine problem.
Dr. Alvaro Hunt, an expert in forensic pathology, testified that he performed the autopsy on Sherri Bailes in September of 1994. He found that she suffered severe gunshot wounds from a bullet that passed through her right arm and into her right chest cavity. It then struck her right lung and her aorta. The bullet next went into her abdominal cavity where it struck her spleen and then came to rest against the twelfth rib. A second bullet entered the right side of her abdomen approximately five inches to the right of her navel. The bullet went through the abdomen as well as the membrane which supports the uterus. It lodged in the left side of her buttocks. Both bullets were recovered. The bullet wound to the right side of her chest caused her death. The doctor stated that Ms. Bailes might have been conscious five minutes after being shot, and she could have driven a car a short distance. Chemical analysis of body fluids from the victim's bile and vitreous fluid from the inside of the eye globe indicated that the victim recently had ingested cocaine.
State Trooper Anthony Graffeo, who was formerly an officer with the New Orleans Police Department assigned to the Homicide Division, testified that he investigated the death of Sherri Bailes and the shooting of Elijah Mitchell. On September 22, 1994, the officer went to the 2000 block of Thayer Street, which is located in the Fischer project. By the time the officer arrived, the two victims had been taken to the hospital. At the scene, the officer found a white Oldsmobile parked on the right-hand side. There was broken glass in the back of it and eight spent nine-millimeter casings and a live nine-millimeter round. A black and white Atlanta Falcon's hat found on the ground had a bullet hole through the top right peak. A black Corvette was parked approximately 270 feet beyond the Oldsmobile. The Corvette was off the street and in the bushes. The back window was completely blown out, and the evidence showed it had recently been shattered because little particles of glass still clung to the rim of the windshield. A nine-millimeter spent casing was found in the passenger seat. A pool of blood was still standing in the passenger seat and in the driver's seat. A wrapped white rock of cocaine was also found on the front seat.[1]
The next day the officer met with Shirley Davis, a witness, who gave him the names of the defendants. She said Larry Lindsey was the perpetrator and a man named "George" was with him. Ms. Davis was shown a photographic line-up and selected the picture of Larry Lindsey. Sherri Bailes died on the way to the hospital and although he was in critical condition, Elijah Mitchell recovered. *620 After an arrest warrant for Larry Lindsey was issued, he was arrested on October 6, 1994. Meanwhile the officer discovered the full name of George Crawford, and Elijah Mitchell also named him as a perpetrator. A photographic line-up was prepared, and Mitchell selected George Crawford's photo.
Officer Byron Winbush, an expert in firearms examination and analysis, testified that a firing pin makes an impression on the bullets fired, and all bullets fired from the same gun contain similar impressions and are different from bullets fired from another gun. Officer Winbush tested the bullet casings and the two bullets that were recovered in this case. The two bullets taken from the victim's body matched each other, indicating both were fired from the same gun. Seven of the nine casings matched each other, indicating they were fired from the same gun, and the other two casings matched each other. Officer Winbush could not say that the two recovered bullets belonged to either set of casing. He noted that the bullets could belong to either group of casings. The officer testified that all the casings could not have come from the same gun. Two guns were involved in the shooting.
Elijah Mitchell, the twenty-eight year old survivor of the shooting, testified that he was with Sherri Bailes, his girlfriend, when she was killed. Mitchell said that Ms. Bailes had come to Thayer Street to pick him up. She was alone in her Corvette when he got into the front passenger seat. The two began arguing. Suddenly, Mitchell was aware that someone was approaching from the right. As he turned, he was shot in the head. He turned more to the right, and he was shot twice in the face and again in his shoulder. He fell back against the seat and was shot "a couple more times." Mitchell said the two men who shot him were "Larry and George." Larry Lindsey was carrying a "Tech 9" weapon, and George Crawford had a pistol. Lindsey had a black bandana over his nose and mouth. Mitchell said he was shot ten times, and he raised his shirt to show the jury the scars on his stomach. After the shooting started, Ms. Bailes' car began moving and moved thirty or forty yards before stopping. Mitchell identified the black hat with the bullet hole in the top as the one he was wearing when the shooting occurred.
Mitchell was shown two photographic line-ups from which he selected the photos of the defendants. Mitchell said he was involved in three arguments with the defendants: the first was really Sherri Bailes' argument, the second concerned Mitchell's cousin, and the third was about Mitchell's property. After the third argument and only two days prior to the shooting, the men threatened him. Mitchell admitted he has two prior convictions from New Orleans: one from 1990 for receiving stolen goods, and the other from 1989 for simple burglary. Mitchell has two other convictions from Dallas: one for burglary of a building, and the other for possession of cocaine. Both are from 1996. He received five years and two years probation respectively for the convictions in Dallas. At the time of trial Mitchell was incarcerated in Texas for violating his probation.
Detective Gary Marchese, of the Homicide Division, testified that he showed a photographic line-up to another witness. He said Shirley Davis came to police headquarters to look at the photographs. She identified the photo of George Crawford.
Ms. Shirley Davis testified that she was living at 1020 LeBoeuf Street, *621 Apartment 1C, in the Fischer Project in September of 1994 when she witnessed a shooting. Ms. Davis said as she was parking in the back driveway, she noticed a car behind her. Ms. Davis recognized both Larry Lindsey and George Crawford. Lindsey is her ex-brother-in-law, and she had seen Crawford in the project for a few months. She knew his first name was George. When the two men got out of the car, they had guns in their hands and blue bandanas over their mouths. The men walked through the breezeway, and then the shooting started. Ms. Davis said she saw them shooting at two people in a black Corvette. After the shooting, the two gunmen walked back to their car and drove away. A few days later when Ms. Davis went to police headquarters to view a photo line-up, she selected Larry Lindsey's picture. Sometime later Ms. Davis looked at another line-up and selected George Crawford's picture. Ms. Davis said that her mother and several of her cousins were in the courtyard when the shooting took place. She declared that she never spoke with them about the shooting.
The defense offered a stipulation that if Officer Kyle Henry were to testify, he would say that when he arrived at the scene of the crime, he observed a black Corvette with the rear window and passenger-side window shattered. In the car were two victims suffering from multiple gunshot wounds, and neither person could give a statement.
Crawford's present application raises four claims: (1) the evidence was insufficient to support his conviction; (2) the State failed to produce Brady material; (3) trial counsel was ineffective; and (4) appellate counsel was ineffective.

Claim of Insufficient Evidence
Initially, Crawford contends that the evidence presented at trial was insufficient to support his first-degree murder conviction. He alleges that the testimony of the two eyewitnesses, one of whom was a victim, was so contradictory as to render the testimony unbelievable.
In State v. Sellers, XXXX-XXXX, p. 4 (La. App. 4 Cir. 4/10/02), 818 So.2d 231, 234, this court provided the general test for determining the sufficiency of evidence:
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132, 1134. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. A reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992).
Crawford was convicted of first-degree murder, which is defined in pertinent part by La. R.S. 14:30 as the killing of a human being "[w]hen the offender has the specific intent to kill or to inflict great bodily harm upon more than one person." La. R.S. 14:30A(3). In the present case, the physical evidence proved that the perpetrators killed Ms. Bailes while trying to kill or inflict great bodily harm on Mr. Mitchell. Crawford does not argue that the State failed to prove that a first-degree murder occurred. Instead, Crawford argues *622 the State failed to prove he was one of the men who committed the first-degree murder.
Crawford complains that the evidence was insufficient because the testimony of the two witnesses, Ms. Davis and Mr. Mitchell, is mutually exclusive, and the testimony of Ms. Davis contains so many internal contradictions that it is unbelievable.

Testimony of Ms. Davis
Crawford initially points to the testimony of Ms. Davis that the perpetrators only shot from the porch area of the courtyard, in contrast to Mr. Mitchell's testimony that the men were walking up to him when they began shooting at the car. However, Ms. Davis testified that she saw the perpetrators begin shooting when they were walking through the breezeway. In addition, when later asked if all shots were fired from the porch, she replied that the perpetrators "came up off the porch" when they were shooting.
Crawford next points to Ms. Davis' contradictory testimony as to whether she saw the shooting. Ms. Davis first testified that she saw the perpetrators shooting when they got to the front of the breezeway and that the perpetrators were still walking through the breezeway when they began shooting. She also testified that she saw both perpetrators firing. Crawford claims that Ms. Davis' testimony is inconsistent as to whether she saw the shooting at the front of the building. The prosecutor asked Ms. Davis: "[Y]ou didn't see who did the shooting outside in front of the building on Thayer? Is that correct?" Ms. Davis replied, "Yes." Although Crawford describes this testimony as Ms. Davis admitting she did not see any of the shooting, the question presented her to was whether she saw the shooting after the perpetrators exited the breezeway and walked to the front of the building, where Ms. Davis insisted at trial she did not go. Her answer that she did not see the shooting after the perpetrators got to the front of the building does not contradict her testimony that she saw the perpetrators shooting in the breezeway.
Crawford next points to Ms. Davis' testimony as to whether the perpetrators had their faces covered when they got out of their car. When asked, "... when they first got out of the car, did they already have the bandannas on?" Ms. Davis replied, "Yes." Later, she testified that the men put the bandannas on "as soon as they got out of the car." Ms. Davis testified that the bandannas were only over the men's mouths, and she was acquainted with at least Lindsey at the time of the shooting. This "inconsistency" did not render her testimony unbelievable.
Crawford asserts that casings were found in the street and in the path of the shots, despite Ms. Davis' testimony that the shootings occurred fifty feet from where the car was parked. As noted above, however, Ms. Davis testified that she did not go to the front of the building while the shooting occurred, and her only viewpoint during the shooting was in the breezeway, where she testified that the shooting began.
Finally, Crawford refers to Ms. Davis' testimony that she did not discuss the shooting with anyone until she contacted the police the day after the shooting. Although Crawford finds this testimony suspect, there was no evidence presented at trial to show that Ms. Davis discussed the shooting prior to that time.

Testimony of Mr. Mitchell
Crawford also attacks Mr. Mitchell's credibility. Initially, Crawford avers that Mr. Mitchell's testimony, that he could be shot in the head and still be able to see who shot him, was "patently unbelievable." *623 However, the jury was aware of the fact that Mr. Mitchell was shot in the head, and it apparently chose to believe his testimony. A fact finder's credibility decision should not be disturbed unless it is clearly contrary to the evidence. State v. Huckabay, XXXX-XXXX (La.App. 4 Cir 2/6/02), 809 So.2d 1093, writ denied XXXX-XXXX (La.11/1/02), 828 So.2d 564; State v. Harris, 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432, writ denied, XXXX-XXXX (La.9/21/01), 797 So.2d 60. In the present case, the jury was able to observe Mr. Mitchell's demeanor while testifying. In addition, Mr. Mitchell knew both defendants, and he testified that he was shot as he turned his head toward the men.
Crawford notes that Mr. Mitchell testified that he was conscious enough to identify the perpetrators at the scene, but no one asked him to do so. The parties entered a stipulation that the responding officers would testify that neither victim was able to give a statement at the scene. Considering that Mr. Mitchell had just been shot several times, it is not unreasonable that he did not give a statement at the scene. Crawford also asserts that Mr. Mitchell admitted he had prior convictions. However, the jury was aware of this but chose to believe Mr. Mitchell's testimony. The jury as fact finder makes credibility calls, and the jury must have concluded that Mr. Mitchell's prior convictions did not render his testimony unbelievable.
Crawford also argues that because the testimony of Mr. Mitchell and Ms. Davis is mutually exclusive, there was no evidence to support his conviction. As reviewed above, their testimonies are not entirely mutually exclusive, because Ms. Davis' testimony concerned her observations of the shooters as they were walking through the breezeway, while Mr. Mitchell's testimony concerned his observations from within the car. The jury heard both witnesses, and it was free to believe either witness' testimony concerning the shooting and the witnesses' ability to see the shooters.
Given the fact that Mr. Mitchell testified that he knew both defendants, and Ms. Davis testified that she knew one well and recognized the other from the area, the jury acted well within its discretion in believing both witnesses when they identified Crawford as one of the perpetrators. The evidence was sufficient to support the jury's finding that Crawford was one of the perpetrators of the shooting.

Brady Material
Crawford contends that the State withheld exculpatory material that, if known by counsel, could have been used to impeach the credibility of both Ms. Davis and Mr. Mitchell. He asserts that the suppression of this impeachment evidence undermined confidence in the jury's verdict against him.
The withheld material to which Crawford refers are the statements of Ms. Davis and Mr. Mitchell, as well as the 911 tapes, Mitchell's medical records, and various police reports.
To comport with the dictates of the due process clause of the Fourteenth Amendment, the State must disclose to the defense evidence that is favorable to the defense and is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Porter, 98-0279 (La.App. 4 Cir. 3/15/00), 756 So.2d 1156, writ denied, XXXX-XXXX (La.1/10/02), 790 So.2d 3. Included in this rule is evidence that impeaches the testimony of a witness whose credibility or reliability may determine guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to *624 disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). See also Porter, supra.
Materiality was defined in U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985): "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." The same test is to be employed whether or not the defense makes a pretrial request for exculpatory evidence. Bagley; State v. Phillips, 92-1063 (La. App. 4 Cir. 2/29/96), 670 So.2d 588, writ denied, 96-2131 (La. 9/5/97), 699 So.2d 85.
In Kyles v. Whitley, 514 U.S. 419, 434-435, 115 S.Ct. 1555, 1565-1566, 131 L.Ed.2d 490 (1995), the Court discussed "materiality":
Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant).... Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S., at 678, 105 S.Ct., at 3381.
The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
In State v. Baker, 2000-2520 (La.App. 4 Cir. 11/21/01), 801 So.2d 1196, the State withheld a pretrial statement of a witness to a shooting that left two men dead. During trial, the defense obtained a copy of the statement, which differed to some extent from the witness' pretrial hearing testimony and his trial testimony. The trial court, however, declared a recess for the evening, and defense counsel used the statement the next day during cross-examination to impeach the witness' credibility. On appeal, this court rejected the defendant's claim that he was deprived of his right to a fair trial due to the State's late disclosure of the statement. This court noted that defense counsel was allotted time to prepare a cross-examination based on the statement, and indeed counsel used the statement to impeach the witness. This court also noted that in *625 addition, the trial court withheld the introduction of some photographs based upon this late disclosure. This court pointed to the fact that the jury returned a lesser verdict (second instead of first-degree murder) and found that the late disclosure did not result in a reasonable probability sufficient to undermine confidence in the verdict.
In State v. Kemp, 2000-2228 (La.10/15/02), 828 So.2d 540, the Louisiana Supreme Court held that the late disclosure at trial of a pretrial statement by a witness to a murder undermined confidence in the verdict, and it reversed the defendant's conviction. The defendant was convicted of shooting the brother of a man with whom he was going to have a fight, and the witnesses all testified that the victim was unarmed and trying to stop the shooting when it occurred. There were various witnesses to the shooting, and the defense called the lead investigator in the case, using his police report to impeach the testimony of various witnesses. On cross-examination of the officer, the State played tapes of the witnesses' statements, and in one of the statements, one witness told the police that she heard the victim speaking with the defendant and his companion just prior to the shooting, asking them: "Do you want to fight it out or do you want to shoot it out?" Id., at p. 6, 828 So.2d at 545. Defense counsel objected, contending that the State withheld exculpatory evidence showing a basis for the defendant to believe his opponent would be armed.
The trial court refused to grant a mistrial, finding that this statement was not exculpatory. The Supreme Court reversed the conviction, stating:
While witness statements are normally not discoverable, La.C.Cr.P. art. 723, this discovery rule must give way when a statement contains favorable information for Brady purposes. Kyles, 514 U.S. at 441-45, 115 S.Ct. at 1569-71; see La.C.Cr.P. art. 718. In addition, the prosecution must make timely disclosure of the favorable evidence to provide the defense with adequate opportunity to present the material effectively in its case. State v. Prudholm, 446 So.2d 729, 738 (La.1984). This Court has therefore recognized that late disclosure as well as non-disclosure of exculpatory evidence may deprive the defendant of a fair trial. State v. Williams, 448 So.2d 659, 665 (La.1984); State v. Landry, 388 So.2d 699, 702 (La.1980); State v. Roussel, 381 So.2d 796, 798 (La.1980). As in the case of complete suppression, the state's failure to make timely disclosure of evidence favorable to the defendant must be evaluated in the context of the entire record. Agurs, 427 U.S. at 112-13, 96 S.Ct. at 2402 ("If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."). Given appropriate circumstances, "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others." Kyles, 514 U.S. at 445, 115 S.Ct. at 1571.

Id., 2000-2228 at pp. 7-8, 828 So.2d at 545.
The Supreme Court pointed out that there was evidence from some witnesses that the victim indicated his readiness to fight, and that the forensic evidence did not exclude the possibility that the victim was shot as he reached behind his back for a weapon. The Louisiana Supreme Court found that the withheld witness' statement *626 that the victim offered the option of gunfire to settle the dispute possessed "... such potential to give the evidence at trial an entirely different cast that undermines the confidence in this jury's rejection of relator's self-defense claim. To this extent, the state's failure to provide timely disclosure impacted the fundamental fairness of the proceedings leading to relator's conviction." Id., at p. 9, 828 So.2d at 546 [emphasis added].

Impeachment Material as to Mr. Mitchell's Testimony
The statements of Mr. Mitchell and Ms. Davis were not given to the defense prior to or during trial. Crawford maintains that his counsel received these statements (as well as the 911 log, Mitchell's hospital records, and various police reports) pursuant to a public records request after Crawford's conviction and sentence became final.
Initially, Crawford contends that the State withheld Brady material contained in Mr. Mitchell's statement given to the police. Crawford asserts that he could have used the information in Mr. Mitchell's statement to impeach his credibility as to being able to recognize Crawford as one of the shooters.
Crawford argues that at trial Mr. Mitchell testified that he knew both Crawford's first and last names. In his statement to the police, given shortly after Mr. Mitchell was released from the hospital, he stated that he did not know "George's" last name. However, in both the statement and in his trial testimony Mr. Mitchell stated he knew George because George hung around his neighborhood with Lindsey, whom he identified by both first and last names. In his statement, Mr. Mitchell described Lindsey and the defendant as the neighborhood "bullies" with whom he had argued several times, the last time being two days before the shooting. Whether or not Mr. Mitchell knew Crawford's last name, in both his statement and in his testimony at trial he stated he knew both Lindsey and Crawford from the neighborhood. He positively identified Crawford in the photographic lineup and in trial as one of the perpetrators. Mr. Mitchell's statement as to whether he knew George's last name was inconsequential with respect to Mr. Mitchell's physical identification of Crawford as one of the perpetrators based on Crawford's physical appearance, regardless of his name.
Crawford refers to Mr. Mitchell's testimony that both assailants shot at him from directly outside the window of the car. He contends that it would have been impossible for Mr. Mitchell to see through the small window of the Corvette. At trial, Mr. Mitchell testified that both shooters were beside the car, not behind it. He also testified that the car door was open at the time of the shooting. He was observing the two men through the open door, not just through the window of the door. In his statement, he placed both men at the side of the car, and he stated that when he first saw them, they were approximately eight yards from the car. He also stated that George was further toward the rear of the car than Lindsey. Mr. Mitchell's statement and his trial testimony were not conflicting.
Crawford also asserts that although Mr. Mitchell told the officers in his statement that George had a smaller gun than Lindsey had, he did not so testify at trial. On the contrary, the trial transcript indicates Mr. Mitchell also testified that George's gun was smaller than Lindsey's gun. The statement did not contain contradictory evidence.
Crawford contends that the State should not have withheld the 911 log because it contained evidence which would have impeached Mr. Mitchell's testimony *627 about the clothes worn by Lindsey's accomplice. Both in his statement and at trial, Mr. Mitchell testified that the accomplice wore a light-colored shirt and tan or khaki pants. Crawford maintains the 911 tape would have shown that this description contradicted a description of the suspects given to the 911 dispatcher by an unknown witness, who indicated that one suspect wore a multi-striped hooded shirt and the other wore a colorful shirt. Crawford avers that had the jury learned of this different description, it would not have believed that Mr. Mitchell had really seen his assailants and would have attributed his identification to his previous altercations with Crawford and Lindsey. Crawford ignores the fact that Ms. Davis' description of the perpetrators' clothing more closely matched that given in the 911 log, and the jury heard her testimony on this point and was aware that it contradicted that of Mr. Mitchell. The jury was aware of these divergent descriptions, and the introduction of the 911 logs, while perhaps different from Mr. Mitchell's testimony on this point, also would have supported Ms. Davis' credibility.
Crawford further argues that the 911 log would have impeached Mitchell's testimony as to the type of gun Lindsey's accomplice had. Crawford asserts that the 911 log "warned the N.O.P.D. that the shooters used automatic weapons," while Mr. Mitchell testified that George had a smaller gun than Lindsey's Tech 9. However, the entry on the 911 log states: "Tell officer to use caution because the subject has automatic weapons." Because of the lack of subject/direct object agreement, it is unclear if both subjects had automatic weapons, or if only one subject had an automatic weapon. The 911 dispatcher was not at the scene. The 911 entry served to warn the officers going to the scene but was not entered directly by an eyewitness. Given the wording, the entry in the 911 log does not contradict Mr. Mitchell's trial testimony and is not Brady material.
Crawford also asserts that Ms. Davis' statement contained impeachment evidence with respect to Mr. Mitchell's testimony. At trial, Mr. Mitchell testified that he was conscious when the officers arrived on the scene, and he indicated he could have identified the perpetrators at the time if anyone had asked him to do so. Crawford argues that Ms. Davis' statement would have impeached this testimony because in her statement she told the police that after the shooting stopped and the assailants fled, she walked over to the car and looked inside, and Mr. Mitchell was gasping and trying to talk. Crawford contends that had he been aware of this statement, he could have impeached Mr. Mitchell's testimony on this point. The jury was aware of Mitchell's true condition, however, through the stipulation given to the jury that if the officers who responded to the scene were to testify, they would state that neither victim was able to give a statement at the scene of the shooting. Ms. Davis' statement was cumulative to what was presented at trial.
Finally, Crawford argues that the State withheld Mr. Mitchell's hospital records, which showed that at the time he was admitted he had both marijuana and cocaine in his system. Crawford asserts that this evidence would have impeached Mr. Mitchell's testimony that he had used no drugs or alcohol on the day of the shooting, but he had done so the day before. He contends that this evidence would have shown Mr. Mitchell was so impaired at the time of the shooting that he could not accurately view his assailants.
The report indicates that Mr. Mitchell's system had cocaine and marijuana, but it is not clear from the report if the presence *628 could only be attributed to use of these drugs on the day of the shooting, or if the results could also be indicative of use the night before, thus bolstering Mr. Mitchell's testimony. There is no indication that Crawford presented evidence at the post-conviction hearing, nor does he present any in his application, showing that the presence and levels of these drugs in Mr. Mitchell's system could only have occurred with use on the day of the shooting. Crawford did not meet his burden of showing that this evidence proved Mr. Mitchell was so impaired at the time of the shooting that he could not identify his assailants.

Impeachment Material as to Ms. Davis' Testimony
Crawford avers that the State's failure to produce Ms. Davis' statement (and apparently the supplemental police report concerning her statement) seriously hampered his ability to impeach her credibility. He argues that because her trial testimony contained various inconsistencies, he would have been able to destroy what credibility she retained, if he had access to her pretrial statement, which contradicted her trial testimony.
Crawford points to her testimony at trial that she was initially unable to give the police a last name for "George", one of the shooters. At trial, Ms. Davis stated she did not know George's last name at the time of the shooting, but she recognized him as someone she had seen in the Fischer Project. By contrast, in her statement given the day after the shooting she first stated that while she knew Lindsey, she did not know the other perpetrator's name, but she had seen him in the project and that the man had "kin people" in the project "cause they was talking ... out there last night." Later in the same statement, Ms. Davis told the officers that she got "the whole name, George Caldwell" from "people around there [who] know that's his name."
In addition, a supplemental police report indicated that prior to making this statement, Ms. Davis called Detective Graffeo and told him that the shooters were Larry Lindsey and George Ascort. Crawford asserts that this evidence would have seriously damaged Ms. Davis' identification of him as one of the perpetrators because it showed she had possibly identified two other men as Lindsey's accomplice.
Ms. Davis said she got the name George Caldwell from others in the project. However, her trial testimony shows she got the name from people who did not see the shooting: She stated: "The people who told me his last name wasn't out there." Although the jury was unaware that Ms. Davis gave two other names, the jury was aware that Ms. Davis initially did not know George's last name. Considering this, Ms. Davis' statement, the supplemental police report, and her trial testimony did not really conflict with each other. In a photographic lineup and at trial, Ms. Davis positively identified Crawford as the George who committed the murder with Lindsey.
Crawford also points to other contradictions between Ms. Davis' statement and her trial testimony. At trial, she testified that Lindsey was wearing a purple sweatshirt and Crawford was wearing a dark shirt, while in her statement she told the police that Lindsey was wearing a dark shirt and the other perpetrator was wearing a purple and white shirt.
Crawford notes that at trial, Ms. Davis testified that both perpetrators had guns when they got out of the car, while in her statement she said she could not see the perpetrator's guns until they had entered the breezeway. In addition, at trial she testified that she never approached the car after the shooting, while in her statement she said that after the assailants fled, she *629 walked over to the car and saw the victims inside. She also testified that her cousins, her mother, and her aunt were on the scene at the time of the shooting, while in her statement she implied she did not know any of the witnesses. Finally, in her statement she said that she saw the perpetrators run through the breezeway, saw them run up to and shoot into the car, and saw the car swerve into the weeds. By contrast, at trial she testified that she saw the perpetrators shooting while in the breezeway, and she denied going to the car after the shooting ended.
The first two discrepancies concerning who wore which shirt and whether the guns were in the perpetrators' hands as they exited their car are distinctions that would not harm her credibility. Both Ms. Davis and Mr. Mitchell testified that both men were armed and both shot at the car. Ms. Davis' implication that she did not know any of the other witnesses does not unduly impinge upon her credibility where it was evident that she was afraid, and therefore, would have been hesitant at first to identify other witnesses, especially her relatives, who were at the scene. The fact that Ms. Davis was afraid is supported by the supplemental police report that stated that Ms. Davis would not testify unless the police got her another apartment.
Crawford's next contention is that Ms. Davis manufactured her statement to get a new apartment. A supplemental police report indicates that Ms. Davis told Detective Graffeo that she saw the shooting, but she would not give a statement unless a new apartment was found for her because the perpetrators had threatened her.
Crawford theorizes that Ms. Davis did not see the shooting but instead manufactured her statement to get a new apartment. Although an apartment was found for her, she declined to take the apartment and still gave the statement. In addition, Crawford mentions that at the time of trial, she was living elsewhere, but he presented no evidence, and there is no indication that her new residence was obtained by the police.
The supplemental report indicates that the reason why Ms. Davis wanted the new apartment was because she had been threatened by the perpetrators, and the court had already ruled that no evidence of any threats could be presented unless the defense questioned Ms. Davis concerning why she waited until the next day to contact the police. Asking her about this condition of giving the statement would fall within this exception to the prohibition on presenting evidence of the threats. Ms. Davis testified that she received nothing from the police. The fact that Ms. Davis rejected the apartment offered to her, supports the veracity of her statement.
Crawford further argues that the State should have produced the 911 log to show that a witness stated to the 911 operator that the perpetrators ran from the scene. He contends this evidence contradicts the testimony of Ms. Davis that the perpetrators walked from the scene. Both the 911 log and Ms. Davis' trial testimony indicated that the perpetrators left the scene. It could also be argued that the 911 log would be inculpatory because flight is an indication of guilt.
Lastly, Crawford contends that the State should have produced Ms. Davis' rap sheet for impeachment purposes. He argues that he could have used her arrests and the fact that she had used an alias to impeach her credibility. However, pursuant to La. C.E. art. 609.1, only convictions may be used to attack the credibility of a witness. There is no showing that Ms. Davis had any convictions. If her rap sheet had been produced without any convictions, *630 the defense could not have used it to impeach Ms. Davis' credibility.

Alleged False Police Testimony
Crawford also refers to Detective Graffeo's testimony. Crawford contends that if the State had produced the supplemental reports and the statements of Ms. Davis and Mr. Mitchell, counsel could have impeached the detective's credibility.
Crawford first points to the fact that Detective Graffeo testified that at trial Ms. Davis could not give him a last name for George. However, a supplemental report indicates that she gave him the name George Ascort when she called him to set up the interview. In addition, in Ms. Davis' statement, she first told him she did not know George's last name, and then she stated she learned from others in the project that his name was George Caldwell. Crawford avers that he could have used this evidence to show that Detective Graffeo lied under oath. Detective Graffeo's testimony did not contradict Ms. Davis' testimony that she did not know George's name, and he testified that he received "numerous" last names of George, including Jefferson and Ashcott. The jury was aware that the police had the names of other Georges.
Crawford also contends that Detective Graffeo testified that although no one was really sure what George's last name was, "[t]hey just knew that he hung around the area. That he didn't live there." Ms. Davis' statement supports Detective Graffeo's testimony. Crawford refers to the supplemental police report, which indicates that the police received an anonymous tip from a woman who indicated George Jefferson could have been one of the perpetrators, and he lived in or frequented the 2000 block of LeBoeuf in the same project. The statement continues, however, that Detective Graffeo ran the name and the address and "did not find any concrete information." Nothing indicates that this testimony was false.

Evidence of Crawford's Innocence
Crawford also contends that the State withheld evidence that would have proved he was innocent of the murder. Specifically, he alleges that the State received information that George Jefferson might have been one of the shooters, that Jefferson lived in the area, that Jefferson fit the description given by the witnesses, and that Jefferson had a police record, including arrests for firing multiple shots at a man, using an automatic weapon. Crawford attaches to his application various police reports concerning Jefferson which give his address, his vital statistics, and the circumstances of the crimes for which he was arrested.
As noted above, the supplemental police report indicated that Detective Graffeo received an anonymous call from a woman who stated that one of the perpetrators could have been George Jefferson, who lived in or frequented the 2000 block of LeBoeuf Court in the Fischer Project. The report further indicated that a check of that name and address led to no "concrete information."
Crawford obtained public records which show that George Jefferson, who lived at 2025 LeBouef Ct., Apt. 3C, had been arrested for an aggravated assault occurring a year earlier in the same project, which occurred by shooting a semi-automatic gun at the victim. Crawford also obtained George Jefferson's rap sheet, which indicated Jefferson listed his address on LeBoeuf Court as well as an address in Gretna. In his pretrial statement to the police, Mr. Mitchell stated that both Lindsey and George lived around the block from him, and he lived in Gretna. In addition, Crawford included in his application the affidavit *631 of a private investigator who indicated she obtained a police report concerning Jefferson's aggravated battery of a woman in July, 1995.
In her statement Ms. Davis described George as being a little taller than Lindsey. Crawford has attached a police report from an unrelated crime occurring on the same date as Lindsey's arrest for this case, and that police report indicates Lindsey was 6'0" tall. George Jefferson's rap sheet, the police report of his aggravated assault arrest in June 1993, and the police report of his 1995 murder all indicate he was 6'3" tall.
Crawford argues that had he been given this information prior to trial, he could have used it to prove that Jefferson, who fit the description of the George involved in the shooting, who had lived in both the area of the shooting and near Mitchell, and who had a history of violence, was really Lindsey's accomplice. It is unclear if the State had this evidence in its file.
In its ruling on the application for post-conviction relief, the trial court noted that even though the pretrial statements of Ms. Davis and Mr. Mitchell were withheld, Crawford "was afforded his due process rights and the outcome of the trial would not have been different," apparently if the statements and other documents had been produced. Crawford has not shown that withholding the information would have impeached the detective's testimony, or that Ms. Davis or Mr. Mitchell's credibility was damaged or rendered their identification of Crawford incredible. Not knowing George's last name had no consequence on whether Ms. Davis and Mr. Mitchell could identify the person as one of the perpetrators upon seeing him in his photo and in person at trial. Both Ms. Davis and Mr. Mitchell did not identify an unknown person but they testified that they knew the defendant (Crawford) previously as someone who had been in the area.
The jury was aware that the police had the names of several Georges. Although they were uncertain of George's last name, both Mr. Mitchell and Ms. Davis positively identified George Crawford as Lindsey's accomplice by his physical presence at separate photographic lineups and at trial. There is no showing that the additional information from the statements, supplemental police report, or 911 log undermined confidence in the jury's verdict and the outcome of the trial.

Claim of Ineffective Assistance of Trial Counsel
Crawford contends that his trial counsel was ineffective. It is unclear whether the trial court expressly ruled on this ground; however, in the interest of judicial economy, the issue is reviewed.
In State v. Mims, 97-1500 pp. 44-45 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, 72, writs denied 2000-2255 (La.6/22/01), 794 So.2d 781 and 2000-2270 (La.6/22/01), 794 So.2d 782, this court discussed the standard to evaluate an ineffective assistance of counsel claim:
The defendant's claim of ineffective assistance of counsel is to be assessed by the two-part test announced in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See State v. Fuller, 454 So.2d 119 (La. 1984). The defendant must show that his counsel's performance was deficient and that this deficiency prejudiced him. The defendant must make both showings to prove counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir. 1992). Counsel's performance is not ineffective unless it can be shown that he or she made errors so serious that he or she was not functioning as the "counsel" guaranteed to the defendant by the 6th *632 Amendment of the federal constitution. Strickland, supra, at 686, 104 S.Ct. at 2064. That is, counsel's deficient performance will only be considered to have prejudiced the defendant if the defendant shows that the errors were so serious that he was deprived of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 693, 104 S.Ct. at 2068.
Crawford initially argues that counsel at trial was ineffective because he failed to obtain Mr. Mitchell's driver's license, which would have shown that Mitchell was so nearsighted that he could not drive without wearing corrective lenses and without using a special side mirror. Crawford argues that this document was easily obtainable (his investigator obtained it for his post-conviction relief application), and counsel could have used it to impeach Mr. Mitchell's ability to see his attackers. There is no indication, however, that there was any evidence to make counsel believe that Mr. Mitchell had any visual disability, which would have alerted counsel to the possibility that Mr. Mitchell had vision problems. Nor is there any indication of whether or not Mr. Mitchell was wearing corrective lenses at the time of the shooting, be they glasses or contact lenses. It cannot be said that counsel was ineffective for failing to obtain Mitchell's driver's license prior to trial.
Crawford also contends that counsel was ineffective because he did not hire expert witnesses who could have shown that the placement of the shells proved the shooting could not have occurred as Ms. Davis testified that it did. There is no indication that counsel was aware prior to trial of how Ms. Davis was going to describe the shooting. Defense counsel did not have a copy of Ms. Davis' statement to the police. There is no indication in the record that Ms. Davis testified at any pretrial hearing. Defense counsel could not have known until trial what her testimony would be, and his "failure" to secure an expert to contradict Ms. Davis' testimony concerning the positions of the shooters did not render him ineffective.
Crawford avers that trial counsel was ineffective for failing to question Ms. Davis about her two-month delay in identifying Crawford as one of the perpetrators. He admits that counsel did not pursue this line of questioning because of a ruling on a motion in limine, allegedly filed by his codefendant, which prohibited the State from mentioning threats made to Ms. Davis, unless either codefendant questioned her about this delay in contacting the police. In that case, the State could question her about threats she received. Crawford maintains that his counsel was ineffective for "agreeing" to this ruling. He theorizes that because his codefendant filed the motion in limine, any threats to Ms. Davis must have come only from his codefendant, not from him, and thus counsel should not have "agreed" to this ruling. In a footnote, he points out that the transcript of the hearing on the motion in limine was not in the record, and he later argues that appellate counsel was ineffective for failing to request this transcript for appeal (as discussed below). However, Crawford did not provide the transcript in preparation for his post-conviction relief application. That transcript is not before this court, and it would be speculative to conclude that Crawford's conduct was not involved in the motion in limine. The fact remains that the trial court ruled that defense counsel could question Ms. Davis about her delay in contacting the police *633 only upon pain of the evidence of threats being placed before the jury. Counsel's compliance with this ruling, a violation of which would have informed the jury of the threats, did not constitute ineffective assistance of counsel.
Crawford also asserts that his defense counsel was ineffective in his cross-examination of Detective Graffeo, the lead investigator in the murder. He first argues that if the defense counsel had compared Detective Graffeo's testimony at a pretrial hearing with the State's answer to his bill of particulars, the defense counsel could have discovered that Detective Graffeo testified falsely at the pretrial hearing when he stated that the codefendant did not give a statement to the police. Crawford contends that defense counsel could have used this information to impeach Detective Graffeo's credibility. He further avers that his defense counsel could have presented evidence that Detective Graffeo first obtained Crawford's name from his codefendant, rather than from a witness, and he theorizes that his codefendant would have been much more likely to name an innocent person (Crawford) as his accomplice rather than his real accomplice, who could have given the police information damaging to him. Crawford asserts that cross-examination of Detective Graffeo on this point "would have cast great doubt on the thoroughness of his investigation."
It is true that Detective Graffeo did not mention that he had received Crawford's name from Lindsey; Detective Graffeo only testified that "[d]uring my investigation I found that the last name of the subject was George Crawford." It is not clear how the jury's learning that Detective Graffeo got Crawford's name from Lindsey would somehow make it appear that Detective Graffeo's investigation was incomplete. Detective Graffeo may have initially obtained Crawford's name from Lindsey, but the fact remains that both Mr. Mitchell and Ms. Davis identified Crawford in photographic lineups and at trial. In addition, the fact that Detective Graffeo testified at a pretrial hearing that Lindsey did not make a statement would not, as theorized by Crawford, have so damaged the detective's credibility as to make his testimony unbelievable or to have made the jury find that his investigation of the case was incomplete.
Crawford also contends that counsel was ineffective because counsel fell asleep during the State's direct examination of both Ms. Davis and Mr. Mitchell. In support of this claim, he presents an affidavit from a spectator in the court. The "spectator" is his mother. Given this relationship, the trial court did not err in failing to give credit to this claim, which is supported only by the affidavit of Crawford's mother.
Finally, Crawford argues that trial counsel was ineffective because he failed to file a motion for directed verdict at trial due to the insufficiency of evidence presented. This claim fails on two grounds. Initially, Louisiana does not have a motion for directed verdict in criminal cases. The vehicle for seeking an acquittal at the end of the State's case is a motion for acquittal, but pursuant to La. C.Cr.P. art. 778, it may be filed only in a bench trial. Secondly, as noted in the discussion of Crawford's first claim, the State presented sufficient evidence to support his conviction.
We find no merit to Crawford's claims of ineffective assistance of his defense counsel at trial.

Ineffective Assistance of Counsel on Appeal
By his final claim, Crawford contends appellate counsel was ineffective. *634 Again, the trial court's judgment did not expressly address this issue; however, in the interest of judicial economy, this Court will address the issue. Crawford asserts that counsel's brief was insufficient pursuant to Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and State v. Jyles, 96-2669 (La. 12/12/97), 704 So.2d 241. Crawford argues that the brief was deficient because appellate counsel did not point out the contradictory testimony of Ms. Davis and Mr. Mitchell. He notes that the brief contained a list of defense objections and the court's rulings, without a full explanation of why counsel was not raising error as to these objections. Crawford also theorizes that appellate counsel reviewed only the trial transcript in connection with this appeal. He finally argues that appellate counsel was ineffective because he did not seek to supplement the appeal record with the transcript of the motion in limine.
With respect to the testimony of Ms. Davis and Mr. Mitchell, the jury heard the testimony of both witnesses, and as noted above, the evidence presented at trial was not so confusing or contradictory as to render it unbelievable. There was sufficient evidence to support the verdict if the jury believed the witnesses. It cannot be said that counsel was ineffective for failing to point out the inconsistencies in his brief. Likewise, nothing indicates that appellate counsel only reviewed the trial transcript prior to filing his brief. This court had a full record on appeal, and counsel's brief includes a procedural history that could not have been gleaned from a review restricted to a reading of the trial transcript.
Crawford's claim as to appellate counsel's failure to supplement the record with the transcript of the motion in limine has no merit. Crawford argues that because the motion was filed only by the codefendant, it must not have pertained to him in any way. Crawford does not include in his application a copy of the transcript of the motion in limine. It is unclear from the docket master and minute entries when this motion was filed, who filed it, or when it was actually heard. The only reference to it in the application before this Court, occurred just prior to the beginning of testimony, when the trial court noted that the motion was granted. The trial court did not indicate who filed the motion, and it merely stated that it had "previously" ruled on the motion. Crawford contends that: "[a]bsent further information about the circumstances surrounding this hearing, there is no way to argue intelligently that the ruling either unfairly prevented Mr. Crawford from cross-examining Davis, or that the trial should have been severed at that point." Crawford further argues that because Lindsey filed the motion, "it was quite possible, even probable, that only Lindsey was implicated in any threats."
The above-quoted passage demonstrates that Crawford does not know what was contained in the transcript; however, he did not obtain a copy of the transcript in preparation of his application for post conviction relief. His "assertions" are, in essence, guesswork on his part as to whether there was any information elicited at the hearing that would have shown that the threats to Ms. Davis originated only from his codefendant. To show counsel was ineffective for failing to get this transcript, Crawford has the burden of showing that the transcript would have reflected that the motion pertained only to threats by Lindsey to Ms. Davis, thereby showing prejudice to him by the trial court's limitation on his right to cross-examine Ms. Davis. Considering that Crawford has the burden of showing counsel was ineffective, he cannot show that his right to cross-examine Ms. Davis was wrongfully impinged. *635 Crawford has not shown that appellate counsel was ineffective for failing to get the transcript of the hearing on the motion in limine.
Crawford attaches a copy of an error patent brief filed by another attorney in another case, as demonstrating what should be raised in an error patent brief to comport with Anders, supra, and Jyles, supra. However, appellate counsel's errors patent brief in this case was reviewed by the Louisiana Supreme Court in its grant of certiorari from this court's ruling on the appeal, and the Court denied writs in this case.
Accordingly, the defendant's conviction and sentence are affirmed.
WRIT GRANTED; RELIEF DENIED; CONVICTION & SENTENCE AFFIRMED.
NOTES
[1] The parties stipulated that the rock was tested and proved to be cocaine.