MAX N. TOBIAS, JR., Judge.
 

 |, On 15 November 2007, the defendant, Chawn M. Desilva (“Desilva” or “the defendant”),
 
 [1]
 
 was charged with possession of cocaine, a violation of La. R.S. 40:967 C(2). On 25 January 2008, he entered a plea of not guilty. On 19 March 2008, the district court denied Desilva’s motion to suppress the evidence and found probable cause to hold him for trial. On 30 April 2008, following a bench trial that the defendant himself elected on the record, Desilva was found guilty as charged. He was sentenced on 19 September 2008 to serve three years at hard labor with credit for time served and recommended for the Impact Program. His motion for reconsideration of his sentence was denied.
 
 [2]
 

 FACTS
 

 Detective Burmaster’s Testimony
 

 On direct examination, Detective Derrick Burmaster stated that on 12 |2October 2007 at approximately 10:30 p.m., he and Detective Leonard Davis were on proactive patrol and drove into the driveway of the Basin Street courtyard (300 Basin Street) of the Iberville Housing Project in New Orleans. They observed a black Dodge Charger automobile blocking the street. Standing in front of the Charger was Desilva and another man, engaged in a loud verbal argument. The detectives waited to see if the two men would disperse but they did not. The detectives exited their vehicle and approached both men. Upon seeing the detectives, the second man fled the scene. Detective Davis ran in pursuit, but was unable to apprehend him. The defendant turned and began to walk back towards the Charger. Detective Burmaster ordered him to stop; he did not and proceeded to enter the Charger on the driver’s side. Detective Burmaster observed Desilva reach onto the top of the car’s roof and grab a crumbled piece of white paper. The paper opened, and Detective Burmaster observed what he believed was crack cocaine. As Detective Burmaster leaned into the driver’s side door he noticed that Desilva had his right hand buried inside the back of his pants. The detective believed that Desilva was attempting to conceal the cocaine between the crevices of his buttocks. He removed Desilva from the Charger and attempted to handcuff him. A struggle ensued, during which Detective Burmaster detected the odor of feces on the defendant’s hand. He observed some white sticky crumbs on Desilva’s fingers that smelled like feces. He believed the white crumbs to be crack cocaine. Desilva was arrested.
 

 As Detective Burmaster began to inform Desilva of his
 
 Miranda
 
 rights, Desilva interjected, “Shut up, b* * *h. I know my f* * * * *g rights.” The defendant continued to physically struggle, resisted arrest, and continued his vulgar verbal tirade. Eventually, Desilva was subdued, placed inside the police unit, and Istransported to the crime abatement team trailer located at 2401 Cleveland Avenue. Once inside the trailer, Detective Burmas-ter ordered the defendant to remove the
 
 *1188
 
 piece of white paper from his buttocks. He refused and continued to physically and verbally resist arrest. Another struggle ensued, and Desilva was wrestled to the ground; Detective Burmaster removed the white piece of paper from between the cheeks of the defendant’s buttocks. A preliminary field test revealed that the substance found wrapped inside the piece of white paper was positive for cocaine. De-silva continued to yell, scream, and curse and several times yelled at Detective Bur-master, “Satan, I rebuke you. Satan, I rebuke you.”
 

 On cross examination, Detective Bur-master stated when he observed Desilva arguing with the other man. The Charger’s headlights and the police unit’s headlights were on; he stated that he was able to see clearly. Desilva’s loud verbal argument constituted, in his view, disturbing the peace. The piece of white paper was not inside Desilva’s rectum but between his buttocks cheeks. Detective Davis witnessed Detective Burmaster remove the piece of paper from the accused’s buttocks. Detective Burmaster denied that he penetrated Desilva’s rectum. The defendant’s accusation that his rectum was bleeding was proven false. No blood was visible on a gauze pad given to the defendant by Captain Joseph, which Desilva used to wipe himself. When Detective Burmaster began to give Desilva his
 
 Miranda
 
 rights, Desilva interrupted him and began to recite his rights to the detective.
 

 Desilva’s Testimony
 

 Desilva testified on his own behalf. On direct examination he stated that on the night in question he was driving out of the Basin Street driveway of the Iberville Housing Project, where he lived, when Detectives Burmaster and Davis [^blocked his path with them police unit. The detectives then choked a man that was exiting his apartment, wrestled the man to the street,. searched him, and then let him go. The detectives then drew them weapons and ordered Desilva out of his vehicle. Desilva stated that he complied and placed his hands on top of the vehicle. He testified that Detective Burmaster conducted a pat down search and violently rubbed his hand between his (Desilva’s) buttocks cheeks. Desilva reacted violently to this touching. Five other officers held him and bent him over the hood of the car. He was then handcuffed and struck several times. He asserted that Detective Burmaster violently removed the piece of paper from his buttocks. He denied the cocaine was his and insinuated that the police planted the cocaine.
 

 On cross examination, Desilva denied arguing with anyone on the night of his arrest. He stated that he was driving out of the Iberville Project when he observed the police arguing with a man named Swinger Gates. The police choked Gates but let him go because they did not find any drugs on him. Desilva refused to answer questions about prior convictions for theft from 1995 to 2005, stating repeatedly that he did not remember. He denied resisting arrest and stated that he was cooperative until Detective Burmaster attempted to penetrate his rectum.
 

 ERRORS PATENT
 

 A review of the record for errors patent reveals none.
 

 ASSIGNMENT OF ERROR NUMBER 1
 

 In his sole assignment of error, Desilva asserts that he was denied effective assistance of trial counsel.
 

 In
 
 State v. Mims,
 
 97-1500, pp. 44-45 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, 72, this court discussed the standard to be used to evaluate an effective assistance of counsel claim:
 

 Generally, the issue of ineffective assistance of counsel is more properly ad
 
 *1189
 
 dressed in an application for post-conviction relief filed in the trial court, where a full evidentiary hearing can be conducted.
 
 State v. Smith,
 
 97-2221, p. 14 (La.App. 4 Cir. 4/7/99), 734 So.2d 826, 834,
 
 writ denied,
 
 99-1128 (La.10/1/99), 747 So.2d 1138. Only if the record discloses sufficient evidence to rule on the merits of the claim does the interest of judicial economy justify consideration of the issues on appeal.
 
 Id.
 
 ...
 

 The defendant’s claim of ineffective assistance of counsel is to be assessed by the two-part test announced in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 
 See State v. Fuller,
 
 454 So.2d 119 (La.1984). The defendant must show that his counsel’s performance was deficient and that this deficiency prejudiced him. The defendant must make both showings to prove counsel was so ineffective as to require reversal.
 
 State v. Sparrow,
 
 612 So.2d 191, 199 (La.App. 4 Cir.1992). Counsel’s performance is not ineffective unless it can be shown that he or she made errors so serious that he or she was not functioning as the “counsel” guaranteed to the defendant by the 6th Amendment of the federal constitution.
 
 Strickland,
 
 mpra, at 686, 104 S.Ct. at 2064. That is, counsel’s deficient performance will only be considered to have prejudiced the defendant if the defendant shows that the errors were so serious that he was deprived of a fair trial. To carry his burden, the defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 at 693, 104 S.Ct. at 2068.
 

 See also State v. Crawford,
 
 02-2048 (La.App. 4 Cir. 2/12/03), 848 So.2d 615.
 

 Here, Desilva charges he was denied effective assistance of counsel at trial because his counsel (a) failed to recognize his mental health problems; (b) had a conflict of interest; (c) was unable, by his own admission, to communicate with | Bhim about his defense; (d) was not prepared to offer a proper defense; (e) expressed to the trial court that he felt incapable of rendering effective assistance to him; (f) asked for clarification of his role as defense counsel; and (g) requested discharge from the case. Counsel’s request to withdraw was denied, and the trial court assigned four attorneys who happened to be in the courtroom as Desilva’s co-counsel with his counsel of record.
 

 The record reflects the following exchanges prior to Desilva’s trial.
 

 BY MR. BOURQUE:
 

 Judge, the State has offered, tendered an offer, through Mr. Powell Miller, now on the Record, to Mr. Desilva of a second offender, double bill at five years.
 

 BY THE DEFENDANT:
 

 My conflict of interest constantly coming and telling me what you offer, and I denied it then. We’re not — we’re going to trial. I want to enter my motion to squash [sic].
 

 BY MR. BOURQUE:
 

 Well, squash away, sir.
 

 BY THE DEFENDANT:
 

 Okay.
 

 * * *
 

 BY MR. MILLER:
 

 I would like some clarification as to my role in this trial. Needless to say, communication between Mr. Desilva and I has broken down. He has indicated he—
 

 BY THE COURT:
 

 
 *1190
 
 Okay, Mr. Desilva, you have to make that declaration clear on the Record as to what Mr. Miller’s role is, sir.
 

 _il * *
 

 BY THE DEFENDANT:
 

 I don’t know.
 

 BY THE COURT:
 

 Mr. Miller was your court appointed attorney.
 

 BY THE DEFENDANT:
 

 I never got rid of Mr. Miller in the court appointment. I never got rid of him.
 

 BY THE COURT:
 

 Yes, you did.
 

 BY THE DEFENDANT:
 

 No, I didn’t. I just said he was a conflict of interest. I never stipulated that he was discharged at all.
 

 BY THE COURT:
 

 Well, when you say “a conflict of interest,” that’s an automatic discharge.
 

 BY THE DEFENDANT:
 

 No, it’s not.
 

 BY THE COURT:
 

 Yes, it is.
 

 BY THE DEFENDANT:
 

 No, it’s not.
 

 BY THE COURT:
 

 Well, in the eyes of the Court it is.
 

 [[Image here]]
 

 BY THE DEFENDANT:
 

 |8I don’t — The courts had — I had the — I can’t afford an attorney. The job of the court — of this office is to represent, to appoint me attorney.
 

 BY THE COURT:
 

 And I did that.
 

 [[Image here]]
 

 BY MR. MILLER:
 

 I would say that the lack of ability to communicate with my client does render it impossible to present a defense.
 

 [[Image here]]
 

 BY THE COURT:
 

 Are you ready to proceed. State? Mr. Miller?
 

 BY MR. MILLER:
 

 Before we start, even though he just started, I’d ask that I be discharged of my obligation to represent Mr. Desilva based on our non-communication and my inability to provide a defense today for Mr. Desilva.
 

 BY THE COURT:
 

 Okay, I’m going to deny that request. BY MR. MILLER:
 

 Please note my objection.
 

 [[Image here]]
 

 BY THE COURT:
 

 Any Opening [sic]?
 

 BY MR. MILLER:
 

 I would waive opening, Your Honor.
 

 BY THE COURT:
 

 bOkay.
 

 [To the State] that’s your other witness?
 

 BY MR. BOURQUE:
 

 It is, Judge.
 

 [To the witness] Step Outside [sic].
 

 (Witness complies)
 

 BY THE COURT:
 

 That’s it?
 

 BY MR. BOURQUE:
 

 That’s it.
 

 BY THE COURT:
 

 All right. We’ll allow the sequestration in the case then. Mr. Merritt, would you please have a seat-I’m sorry. Let Ms. Ngubini sit to his immediate right. Mr. Johnson, Step Up [sic],
 
 *1191
 
 please. Have a seat behind Mr. Desilva on the bench. Mr. Laugand—
 

 BY MR. LAUGAND:
 

 Yes, sir.
 

 BY THE COURT:
 

 Step Up [sic], please. I’m drafting all the lawyers. Mr. Williams, have a seat to his left.
 

 BY MR. WILLIAMS:
 

 I may be on the appeal, Judge.
 

 BY THE COURT:
 

 All right. That’s your team, Mr. De-silva. Let’s proceed, Mr. Bourque.
 

 [[Image here]]
 

 In most of Desilva’s brief he argues that the trial court conducted only a cursory inquiry as to whether he voluntarily and intelligently elected to defend | iphimself at trial. He argues that the court’s inquiry was insufficient and did not constitute the exhaustive inquiry into the dangers and disadvantages of self-representation.
 
 Faretta v. California,
 
 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975);
 
 State v. Mahogany,
 
 96-1137 (La.App. 4 Cir. 4/30/97), 694 So.2d 505. He further argues that no inquiry was made into the particular facts and circumstances surrounding his case, including the background, experience, and conduct of the accused.
 
 See State v. Harper,
 
 381 So.2d 468 (La.1980). However, the record reflects that Desilva neither requested to represent himself nor did the court indicate to him that he could represent himself. Instead, the court “drafted” four attorneys to “help” Desilva’s appointed counsel. Therefore, this argument is not supported by the record.
 

 The record is insufficient to address the merits of Desilva’s remaining ineffective assistance of counsel claims in this appeal. We therefore reserve Desilva’s right to assert the additional claims of ineffective assistance of counsel claims in a timely filed (La.C.Cr.P. art. 930.8) application for post-conviction relief, all of which require an evidentiary hearing to be held in the trial court where the facts can be developed.
 
 See
 
 La.C.Cr.P. art. 924,
 
 et seq.
 

 CONCLUSION
 

 Accordingly, we affirm Desilva’s conviction and sentence.
 
 [3]
 

 AFFIRMED.
 

 [1]
 

 . The record is not consistent as to the spelling of the defendant’s surname. It is spelled "Desilva" and “DeSilva.” Hereinafter we spell it "Desilva.” Additionally, the record reflects that the defendant is also known as Shawn M. Desilva and Sean Desilva.
 

 [2]
 

 . The record reflects that a multiple bill hearing is set for 3 March 2009, but we do not know if hearing was held on that date or subsequently; it may be the subject of a separate appeal.
 

 [3]
 

 . See footnote 2, supra.